**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**Danny O. CHERIF,
Defendant–Appellant,**

**and**

**Khaled Sanchou, Nominal
Defendant–Appellant.**

**Nos. 90–1688, 90–1805.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1990.

Decided April 29, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc June 7, 1991.

Gregory Von Schaumburg, Office of the U.S. Atty., Chicago, Ill., Rudolph Gerlich, Jr., Robert E. Patterson, Jacob H. Stillman, Mark Kreitman, and Eric Summergrad, S.E.C., Washington, D.C., for plaintiff-appellee.

Douglass G. Hewitt, Michael P. Mullen, George J. Lynch, and Kendall R. Meyer, Burke, Wilson & McIlvaine, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

The Securities and Exchange Commission ("SEC") brought this civil enforcement action against defendant Danny O. Cherif, alleging that Cherif had violated the antifraud provisions of the federal securities laws, in particular Sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78n(e) (1988), and Rules 10b–5 and 14e–3 thereunder. 17 C.F.R. §§ 240.10b–5 and 240.14e–3 (1990). Section 21 of the Exchange Act allows the court to enjoin further violations of the securities laws upon a showing that defen-

dant did in fact violate the laws or threatens to do so. 15 U.S.C. §§ 78u(d) and (e) (1988). The district court entered an injunction preventing Cherif from future trading and freezing his assets. It also froze two accounts of nominal defendant Khaled Sanchou, Cherif's cousin. It was alleged that Cherif used Sanchou's accounts to facilitate his illegal trades and that the profits from Cherif's trading remained in Sanchou's accounts. Cherif and Sanchou both appeal.

## FACTS

This case, which raises for this Circuit issues of first impression in securities law, had its genesis in a simple, cunning scheme. Danny Cherif was employed by the First National Bank of Chicago ("First Chicago") in its International Financial Institutions Department from October 1979 until December 1987, when his position was eliminated as the result of an internal reorganization. When Cherif's employment with First Chicago ended, he kept his magnetic identification card. The card could be used to enter the First Chicago building if the building's security system recognized the card's owner as a current employee. Cherif's card remained activated after December 1987 because of a memorandum signed purportedly by the Senior Vice–President of the International Financial Institutions Department and sent to the bank's data-entry department. The memo, dated January 26, 1988, stated that Cherif continued to work part-time on a special project for his department and asked that his identification card remain activated. In fact, the Senior Vice–President of Cherif's department had not written or signed the memo, and Cherif was not working on a special project for First Chicago. Cherif admitted later to William Bronec, Jr., who had been a co-worker at First Chicago, that he had reactivated his identification card "by means of false representations."

Using his identification card, Cherif was able to enter the First Chicago building on nights and weekends for over a year after his employment ended. Unbeknown to Cherif, the building's security system automatically recorded his comings and goings.

Cherif's destination within the bank was the Specialized Finance Department, which provides financing for extraordinary business transactions such as tender offers and leveraged buy-outs. The Specialized Finance Department obtained and developed confidential information about these transactions and the companies involved in the transactions from its corporate clients. In an effort to protect this information, the bank required all employees to sign an "integrity policy" restricting the use and disclosure of "material inside information" for personal gain. The policy warned that improper use of such information could result in civil or criminal penalties. Cherif had signed the agreement on three occasions, in 1979, 1986 and 1987.

A comparison of the security system's records with a summary of Cherif's trading activity revealed that during 1988 and the beginning of 1989, Cherif had traded in the stocks of four companies about which the Specialized Finance Department had obtained confidential information. For example, in May 1988, Stone Container Corp. sought First Chicago financing of a proposed acquisition of Consolidated Bathurst Corp. Cherif used his identification card to enter the building on Sunday, May 15, 1988. Cherif then bought 5500 shares of Consolidated Bathurst over the next two weeks and eventually made a profit of over $11,000. The evidence was similar with respect to the other three companies in whose stock Cherif traded. In each case, First Chicago's Specialized Finance Department had acquired confidential information about transactions and targets from a corporate client. Cherif's card was used to make an after-hours entry into the building and, soon after, Cherif bought stock in the company to be acquired or bought out. Cherif made profits on the securities of each of the four companies.

Cherif used two brokerage accounts to make his trades. He opened one brokerage account with Quick & Reilly in March 1988 in the name of Khaled Sanchou, a resident of Tunisia and Cherif's cousin by marriage.

Cherif presented to Quick & Reilly a check for $100,000 signed by Sanchou to open the account and a power of attorney authorizing Cherif to trade in Sanchou's account. Subsequently Cherif was the only person to trade in this account, and he received the monthly statements. In May 1988, Cherif opened a second brokerage account in his own name with Charles Schwab & Co. Profits from short-term securities trading in the two accounts from May 1988 to February 1989 totalled $247,000: $93,000 in the Schwab account and $154,000 in Sanchou's account at Quick & Reilly. Between February and May 1989, Cherif transferred $265,000 from the Quick & Reilly account to a bank account in Sanchou's name at First Chicago. Cherif also has a power of attorney over the First Chicago bank account.

The SEC began investigating Cherif in May 1989. They obtained the cooperation of William Bronec, Jr., a fellow employee at First Chicago until 1985. Cherif had shared the information he acquired from First Chicago with Bronec, who had become Cherif's confidant. Bronec wore a microphone to a meeting with Cherif on May 19, 1989, allowing the F.B.I. to record a conversation in which Cherif admitted he had been using his card to enter the First Chicago building.

The SEC applied for an *ex parte* temporary restraining order on May 21, 1989. The SEC asked that Cherif be enjoined from further violations of the securities laws and that Cherif and Sanchou be enjoined from transferring or disposing of their assets so as to preserve the possibility of recovering civil penalties or disgorgement of illegally obtained profits. The district court entered TROs against Cherif and Sanchou. It ordered each defendant to provide an accounting showing any legitimate claim each had to his own assets. The court additionally gave permission for Sanchou to be served overseas by international express mail.

At the subsequent preliminary injunction hearing on May 31, 1989, the parties agreed to continue the TRO with respect to Cherif to allow discovery to proceed. At his deposition, Cherif did not rebut any of the SEC's evidence. Instead, he invoked his Fifth Amendment right not to incriminate himself. Cherif also failed to provide any accounting. On September 8, the district court entered a preliminary injunction against Cherif, using Cherif's silence to draw inferences adverse to him. The court found that the SEC's uncontested complaint, the record of entries into First Chicago, the trading records for the accounts in Cherif's and Sanchou's names, and the transcript of the 1989 conversation between Bronec and Cherif "constitute[d] an overwhelming *prima facie* showing of Cherif's violation." After freezing Cherif's assets, the court denied a motion that would have modified the injunction to allow Cherif to withdraw $20,000 for attorney's fees. Cherif appeals the grant of the preliminary injunction and the district court's refusal to modify the injunction.

Sanchou, for his part, did not attend the preliminary injunction hearing and filed no response to the SEC's verified complaint. The district court entered a preliminary injunction against Sanchou on the basis of his default. The injunction barred Sanchou from disposing of assets in his name or under his control. Approximately $250,000 remained in Sanchou's Quick & Reilly and First Chicago accounts. The court ordered Sanchou to provide the SEC with an accounting and prohibited him from destroying documents related to the case. Sanchou later filed an appearance and asked the district court to modify the injunction to allow him to pay reasonable attorney's fees. Sanchou also moved to vacate the preliminary injunction, arguing, *inter alia*, that he was never properly served and that, in the absence of any alleged securities violation on his part, the district court lacks subject matter jurisdiction over him. Sanchou appeals from the district court's denial of his motions to vacate and modify the preliminary injunction.

## ANALYSIS

All parties apparently agree that the proper standard for the granting of a pre-

liminary injunction is the usual one.[1] Thus plaintiff was obligated below to establish: 1) reasonable likelihood of success on the merits; 2) unavailability of a remedy at law; 3) injury to plaintiff in absence of injunction outweighing injury to defendant if injunction is granted; and 4) lack of disservice to public interest upon issuance of injunction. *Roland Machinery Co. v. Dresser Industries Inc.*, 749 F.2d 380, 386–389 (7th Cir.1984). This Court will not set aside the issuance of an injunction absent abuse of discretion. *SEC v. Suter*, 732 F.2d 1294, 1301 (7th Cir.1984).

*Cherif*

■ Cherif's central argument on appeal is that the SEC wrongly relied on the "misappropriation theory" to prove violations of federal securities law. Under the theory, which has been adopted by the Second, Third and Ninth Circuits, "one who misappropriates [material] non-public information in breach of a fiduciary duty and trades on that information" violates Section 10(b) and Rule 10b–5. *SEC v. Materia*, 745 F.2d 197, 203 (2nd Cir.1984), certiorari denied, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477. See also *SEC v. Clark*, 915 F.2d 439, 443 (9th Cir.1990); *Rothberg v. Rosenbloom*, 771 F.2d 818, 822 (3rd Cir. 1985), certiorari denied, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 501. Cherif notes first that this Circuit has never adopted the misappropriation theory. He also argues that even if the misappropriation theory is adopted, it cannot be applied to his case. Because Cherif's employment at First Chicago ended in December 1987, he believes that any fiduciary duty owed to First Chicago was extinguished at that time. Thus, Cherif argues, his subsequent conversion of information entrusted to his former employer may have amounted to theft, but it did not constitute fraud.

Cherif's first objection is easily answered because Rule 10b–5 can accommodate the misappropriation theory. Rule 10b–5 makes it unlawful for:

> any person * * * by use of any means or instrumentality of interstate commerce, or the mails or of any facility of any national securities exchange,
>
> (a) to employ any device, scheme, or artifice to defraud, * * * or
>
> (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.[2] The "classical" theory, as developed by the Supreme Court in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348, and *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911, brings corporation insiders and tippees of those insiders within the ambit of Rule 10b–5. Under the classical theory, a person violates the rule when he or she buys or sells securities on the basis of material, non-public information and at the same time is an insider of the corporation whose securities are traded, *Chiarella*, 445 U.S. at 227–228, 100 S.Ct. at 1114, or a tippee who knows or should know of the insider's breach of duty, *Dirks*, 463 U.S. at

---

**1.** We note that the Second Circuit has altered the standard for injunctions requested by the SEC under 15 U.S.C. §§ 78u(d) and (e). See *SEC v. Unifund SAL*, 910 F.2d 1028, 1035–1040 (2nd Cir.1990) (SEC need not show risk of irreparable injury or unavailability of remedies at law but may be required to make a more substantial showing of likelihood of success if injunction sought will be onerous). Because the parties have not argued about the propriety of such a modification, we leave the question for another day.

**2.** Section 10(b) of the Securities and Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> * * * * *
>
> (b) to use or employ, in connection with the purchase or sale of any security registered on a national stock exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC promulgated Rule 10b–5 in 1942 under the authority of Section 10(b).

660–661, 103 S.Ct. at 3264–65. The theory is that an insider owes a fiduciary duty to the corporation's shareholders not to trade on inside information for his personal benefit. *Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115 ("corporate insiders * * * have an obligation to place the shareholder's welfare before their own"). A tippee of an insider owes a fiduciary duty which is derivative of the duty owed by the insider. *Dirks*, 463 U.S. at 660, 103 S.Ct. at 3264 ("a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material non-public information only when the insider has breached his fiduciary duty to the shareholders").

The misappropriation theory extends the reach of Rule 10b–5 to outsiders who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade. The misappropriation theory focuses not on the insider's fiduciary duty to the issuing company or its shareholders but on whether the insider breached a fiduciary duty to any lawful possessor of material non-public information. In *United States v. Newman*, 664 F.2d 12 (2nd Cir.1981), certiorari denied, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 the Second Circuit held that employees at two investment banks violated Rule 10b–5 when they "misappropriated—stole to put it bluntly" confidential information entrusted to their firm. 664 F.2d at 17 (quoting *Chiarella*, 445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting)). *Newman* held that the breach of a fiduciary duty owed by the alleged insider trader to his employer could support a Rule 10b–5 conviction, even in the absence of any duty owed by the employee or employer to the company whose shares the insider traders bought. The Court was not concerned about any fraud perpetrated on the companies whose shares were traded or on the shareholders of those companies, as in *Dirks* or *Chiarella*.[3] Instead it was influenced by the damage

inflicted on the insider trader's employer by a conniving employee. "By sullying the reputations of [their] employers as safe repositories of client confidences, appellee and his cohorts defrauded those employers as surely as if they took their money." *Newman*, 664 F.2d at 17. Trades carried out in connection with such fraud were held to be within the purview of Rule 10b–5.

Similarly, in *SEC v. Materia*, 745 F.2d 197 (2nd Cir.1984), the employee of a financial printer was held liable under Rule 10b–5 for trading upon information the printing company had acquired in confidence from its clients. The Second Circuit found that Materia had perpetrated a fraud upon his employer by misappropriating information entrusted to the printing company. 745 F.2d at 202 ("By purloining and trading on confidences entrusted to Bowne [the printer], it cannot be gainsaid that Materia undermined his employer's integrity").

The Supreme Court has declined to comment on the viability of the misappropriation theory on two occasions. In *Chiarella*, the Court overturned the conviction of the employee of a financial printing company under Rule 10b–5, but both dissenting opinions and a concurring opinion suggested that had the misappropriation theory been presented to the jury and to the Court, the conviction might have been affirmed. See *Chiarella*, 445 U.S. at 238–239, 100 S.Ct. at 1119–20 (Brennan, J., concurring); *id.* at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting); *id.* at 245–246, 100 S.Ct. at 1123 (Blackmun, J., dissenting). In *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 an equally divided Court upheld, without comment, the Rule 10b–5 conviction of R. Foster Winans, a *Wall Street Journal* columnist who had misappropriated and traded upon information contained in upcoming columns.[4]

---

**3.** The court noted that "neither [of the employers] Morgan Stanley, Kuhn Loeb nor their clients was at the time a purchaser or seller of the target company securities in any transaction with any of the defendants." *Newman*, 664 F.2d at 16.

**4.** The Supreme Court has suggested in *dicta* that one subset of traditional outsiders may be liable under Rule 10b–5 directly as "quasi-insiders" rather than through the use of the misappropriation theory. In *Dirks*, the Court wrote in a footnote that:

The Second Circuit Court of Appeals had written perhaps its broadest affirmation of the misappropriation theory in the *Carpenter* case, explicitly rejecting any notion that "[Winans] would have to have breached a duty to the corporations or shareholders thereof whose stock they purchased or sold" to be found guilty of securities fraud. *United States v. Carpenter*, 791 F.2d 1024, 1029 (2nd Cir.1986).

The misappropriation theory has won adherents in numerous circuit and district courts despite the lack of explicit approval from the Supreme Court. The bulk of the cases have arisen in the Second Circuit, see *Newman*, 664 F.2d at 12; *Materia*, 745 F.2d at 197; *Carpenter*, 791 F.2d at 1024; *SEC v. Tome*, 638 F.Supp. 596 (S.D.N.Y. 1986), affirmed, 833 F.2d 1086 (2nd Cir. 1987); *SEC v. Musella*, 578 F.Supp. 425 (S.D.N.Y.1984); *United States v. Willis*, 737 F.Supp. 269 (S.D.N.Y.1990), but the theory has now been adopted by the Third and Ninth Circuits. See *Clark*, 915 F.2d at 439; *Rothberg*, 771 F.2d at 818. District courts in other circuits have welcomed the theory, too. *SEC v. Peters*, 735 F.Supp. 1505 (D.Kan.1990); *United States v. Elliott*, 711 F.Supp. 425 (N.D.Ill.1989).

We join these courts in holding that a person violates Rule 10b–5 and Section 10(b) of the Securities Exchange Act of 1934 by misappropriating and trading upon material information entrusted to him by virtue of a fiduciary relationship such as employment. There is a common sense notion of fraud behind the misappropriation theory. As the *Clark* court put it:

> [B]y becoming part of a fiduciary or similar relationship, an individual is implicitly stating that she will not divulge or use to her own advantage information entrusted to her in the utmost confidence. She deceives the other party by playing the role of the trustworthy employee or agent; she defrauds it by actually using the stolen information to its detriment.

*Clark*, 915 F.2d at 448. We agree that buying or selling securities "in connection with" fraud perpetrated on an employer to obtain material non-public information constitutes a violation of Rule 10b–5.[5]

---

Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired non-public corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. *Dirks*, 463 U.S. at 655, n. 14, 103 S.Ct. at 3262, n. 14. Under this *dicta* presumably someone who worked for First Chicago might be deemed to have a direct fiduciary duty to the shareholders of the client company. Because neither the Supreme Court nor the Courts of Appeals have explicitly adopted the "quasi-insider" theory of liability, however, we decline to apply it to this case.

**5.** The more precise issues of statutory construction and legislative history have been treated exhaustively elsewhere, and we decline to revisit them. There is little question that the vague term "fraud" as used in Section 10(b) and Rule 10b–5 can encompass the misappropriation theory. See *Materia*, 745 F.2d at 201 (misappropriation "falls squarely within the 'fraud or deceit' language of the rule"); *Clark*, 915 F.2d at 449 ("misappropriation theory fits comfortably within the meaning of 'fraud' in § 10(b) and Rule 10b–5"). In addition, interpreting Rule 10b–5 to include the misappropriation theory plainly effectuates the broad purposes behind the securities laws. *Newman*, 664 F.2d at 18–19 (investor protection is not sole aim of securities statutes, rather, statutes represent effort to achieve high standard of business ethics in "every facet of the securities industry"); *Materia*, 745 F.2d at 201 (Section 10(b) "not aimed solely at the eradication of fraudulent trading by corporate insiders").

We note also that Congress has endorsed the misappropriation theory in discussions of the Insider Trading Sanctions Act of 1984 and the Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"). The House Report accompanying the insider trading bill in 1984, which amended certain provisions of the 1934 Act, noted that "deceitful misappropriation of confidential information by a fiduciary" has consistently been held to be unlawful in various areas of the law. H.R.Rep. No. 355, 98th Cong., 2d Sess. 5, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2274, 2278. The report continued, "Congress has not sanctioned a less rigorous code of conduct under the federal securities laws." *Id.* In 1988, the House Committee reporting on the ITSFEA wrote about misappropriation that "this type of security fraud should be encompassed within Section 10(b) and Rule 10b–5." H.R.Rep. No. 910, 100th Cong., 2d Sess. *reprinted in* 1988 U.S.Code Cong. & Admin. News 6043, 6047.

■ The only possible barrier to application of the misappropriation theory to Cherif's case is, as Cherif points out, the fact that his employment with First Chicago ended before he stole and traded upon inside information. Cherif argues that no fiduciary duty existed between him and his employer at any time after December 1987, when he began to obtain information about upcoming transactions from the Specialized Finance Department.

As an initial matter, Cherif misconstrues the nature of his duty to First Chicago. He argues that the terms of the bank's "integrity policy" only prevented him from using information specifically about future transactions obtained while he was on the job. He also believes that the use of such inside information was restricted only to the term of his employment.

Notwithstanding the contractual agreement, Cherif was bound by a broader common law duty. This common law duty obligates an employee to protect any confidential information entrusted to him by his employer during his employment. In addition, an employee is obligated to continue to protect such information after his termination. The Restatement (Second) of Agency § 395 (1958), provides:

> Unless otherwise agreed, an agent is subject to a duty to the principal not to use or communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency * * * in competition with or to the injury of the principal, * * * unless the information is a matter of general knowledge.

This principle prevents former employees from divulging trade secrets, for example. See, e.g., *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir.1987) (applying Illinois law directing that "an employee may not take with him confidential, particularized plans or processes * * * disclosed to him while the employer-employee relationship existed"); *In re Innovative Constructive Systems*, 793 F.2d 875, 880 (7th Cir. 1986) (applying Wisconsin law stating that departing employee may not take "with him * * * trade secrets or processes * * * wrongfully appropriated").

First Chicago did convey confidential property and information to Cherif during his employment. Cherif focuses exclusively on information regarding specific upcoming deals, which he did not obtain until after December 1987. First Chicago entrusted Cherif with other confidential information, however. He was given a key card that was issued to him solely because of his status as an employee. Cherif possessed specific knowledge about the internal procedures of the bank. Recognizing the value of this knowledge, First Chicago in its "integrity policy" explicitly identified its "internal policies" as confidential information which "should not * * * be utilized for personal gain" (R. Item 119, App. C). Despite this restriction, Cherif combined his knowledge of the appearance of his boss's signature and the "internal policy" concerning how requests for continued activation of his key card would be handled by First Chicago to effect his scheme. Cherif also knew where within the bank's non-public offices to find information relating to upcoming transactions.

Cherif breached a continuing duty to his former employer when he used the key card and specific, confidential knowledge he had learned about First Chicago as an employee to break into the bank immediately after termination and steal inside information about upcoming transactions. It makes no difference that Cherif carried out the thefts formally after his employment ended. The confidential property and information he came to possess during his tenure at the bank provided the foundation for the success of the subsequent break-ins. Cherif attained his objective of obtaining deal-specific information by wrongfully converting other confidential information entrusted to him by First Chicago. His trades were "in connection with" a fraudulent scheme to gain access to material, non-public information possessed by First Chicago. This is all the nexus that Rule 10b–5 requires.

Cherif betrayed a trust in a way that a mere thief does not.[6] He used property and information belonging to First Chicago, and made available to him only through his fiduciary relationship, against the bank's own interests. His actions were fraudulent in the common understanding of the word because they deprived some person of something of value by "trick, deceit, chicane or overreaching."[7] *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292, quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968. Cherif may have eroded client confidence in First Chicago, by suggesting the company's susceptibility to treachery from within. See *Newman*, 664 F.2d at 17. We have little difficulty concluding that his course of conduct was fraudulent within the meaning of Rule 10b–5.

■ Cherif's remaining arguments do not merit extensive discussion. For example, he calls attention to the SEC's inability to produce First Chicago documents with his fingerprints on them or surveillance films of him inside the bank. But Cherif's argument as to the sufficiency of the evidence ignores the evidence that the district court did consider. The SEC made available the tape of the conversation between Bronec and Cherif in which Cherif admitted he illegally entered the bank and proclaimed that if the bank found out about his key card, "I'm probably screwed." The court had a transcript of Bronec's plea agreement in which he recounted how Cherif had admitted reviewing documents in the Specialized Finance Department.[8]

The SEC also submitted the bank's records of Cherif's weekend and late-night entries. All of this evidence remains unrebutted at this point because Cherif invoked the Fifth Amendment. The district court permissibly drew inferences from Cherif's refusal to respond to probative evidence in this civil proceeding, see *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 and found that the SEC had presented evidence establishing that violations of the securities laws had occurred.

Cherif also argues that the information he obtained was not non-public. This argument is disproved by the evidence the SEC has offered. The bank protected the confidentiality of the information entrusted to it in connection with proposed extraordinary transactions by, for example, formulating the "integrity policy." The bank treated all information received from clients as confidential, and at times even gave code names to the corporate entities involved in the proposed transactions. As the SEC points out, the fact that a client is considering the acquisition of some other corporation can itself be critical, non-public information. *Materia*, 745 F.2d at 199 ("Because even a hint of an upcoming tender offer may send the price soaring, information regarding the identity of a target is extremely sensitive and zealously guarded").

■ Finally, Cherif contends that the information was not material, mainly because it was too speculative to assume "actual significance in the deliberations of the rea-

6. There has been some suggestion that Rule 10b–5 should apply even to "mere" thieves. See *Chiarella*, 445 U.S. at 246, 100 S.Ct. at 1123 (Blackmun, J., dissenting) (suggesting that any time information is acquired by an illegal act, whether in breach of a fiduciary duty or not, there is a duty to disclose that information to the purchaser or seller with whom the acquirer trades); *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 n. 22, 105 S.Ct. 2622, 2630 n. 22, 86 L.Ed.2d 215 (suggesting that trading on "misappropriate[d] or illegally obtain[ed]" information constitutes fraud in violation of Rule 10b–5). We need not reach this question because of our holding that Cherif breached a fiduciary duty owed to First Chicago.

7. The mere fact that Cherif obtained entry by representing that he continued to work at the bank when in fact he had been discharged would constitute a breach of fiduciary duty. The Restatement (Second) of Agency § 385 (1958) provides that: "Unless otherwise agreed, an agent is subject to a duty not to act as such after the termination of authority."

8. Cherif argues that the plea agreement was inadmissible hearsay. However, hearsay can be considered in entering a preliminary injunction. See *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir.1986).

sonable shareholder" or investor. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757. The information stored in the Specialized Finance Department about the four companies in whose stock Cherif traded was clearly material. It included the identities of proposed targets and proposed terms for acquisitions and management buy-outs, including proposed price ranges. Such information satisfies the materiality requirement of Rule 10b–5. *Clark*, 915 F.2d at 441 (identity of target and price to be offered by acquirer are material information); *Materia*, 745 F.2d at 199 (identities of four tender offer targets discerned in spite of use of code names are material).

The district court did not abuse its discretion in granting a preliminary injunction with respect to Cherif.[9] It made no errors of law and its factual findings are well supported. We will discuss the propriety of modifying the injunction to allow Cherif to pay attorney's fees after addressing Sanchou's arguments.

*Sanchou*

■ Sanchou advances a host of arguments, the most troubling of which is the question of subject matter jurisdiction. Sanchou has not been accused of violating any securities laws (Appellee's Br. at 35). This would seem to make issuance of a preliminary injunction against Sanchou impossible because 15 U.S.C. § 78u(d) specifies that only a person who "is engaged or is about to engage in acts constituting a violation" of the securities laws can be enjoined. The SEC contended initially in its verified complaint that jurisdiction over Sanchou is "necessary and appropriate" pursuant to Fed.R.Civ.P. 19(a) because Sanchou's participation will enable the court to grant complete relief. The SEC argues before this Court that jurisdiction over San-

chou is proper directly under 15 U.S.C. §§ 78u(d) and (e). The SEC believes that the statute authorizes the granting of any kind of ancillary relief, even against third parties, once a violation by one person has been established (Br. at 32–33).

The SEC is understandably anxious to recover Cherif's ill-gotten gains, but neither of the SEC's arguments can support an exercise of jurisdiction over Sanchou to justify divesting him of the funds now in his accounts. Rule 19 alone cannot give the district court subject matter jurisdiction over the dispute with Sanchou because Rule 19 is not a source of federal jurisdiction. *Graf v. Elgin, Joliet & Eastern Railway Co.*, 697 F.2d 771, 775 (7th Cir. 1983). The rule supplies a mechanism by which interested parties can be joined, but it presumes the preexistence of subject matter jurisdiction over some cause of action alleged against the defendant. Subsection (b) of Rule 19 even directs that in cases where subject matter jurisdiction (*i.e.* diversity) would be destroyed by joinder of the "necessary" party, the court must contemplate dismissing the original action.

■ ■ 15 U.S.C. §§ 78u(d) and (e) also cannot aid the SEC since the statute is not so broadly written as the SEC contends. The statute has been construed to allow the granting of "any form of ancillary relief * * * where necessary and proper to effectuate the purposes of the statutory scheme." *Materia*, 745 F.2d at 200. Language about the importance of granting complete equitable relief, however, must be read in context. Usually the language advocates that all equitable powers residing in the district court be visited upon the defendant or violator before the court. See *id.;* Farrand, *Ancillary Remedies in SEC Civil Enforcement Suits*, 89 Harv.L.Rev. 1779 (1976).[10] Nothing in the statute or

---

9. We need not consider whether Cherif violated SEC Rule 14e–3, which prohibits trading while in possession of material, non-public information relating to a tender offer. 17 C.F.R. § 240.14e–3. A showing that Cherif violated Rule 10b–5 is sufficient to uphold the issuance of the injunction.

10. *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332, cited by the SEC

(Br. 33), is not dissimilar. *Porter* involves a statutory provision in the Emergency Price Control Act of 1942 similar to the remedies provision in the Exchange Act. The Supreme Court wrote broadly about the equitable power residing in a district court adjudicating an action brought under the Emergency Price Control Act, but it held only that disgorgement of illegally

case law suggests that 15 U.S.C. § 78u(d) or (e) authorizes a court to freeze the assets of a non-party, one against whom no wrongdoing is alleged.[11]

The foregoing is not meant to suggest that there is no way to recover the funds in Sanchou's accounts.[12] Two possibilities present themselves. First, the SEC could make use of the rather obscure common law concept of the "nominal defendant." Sanchou has, after all, been named in that capacity. This option is explored in more detail below. Alternatively, the SEC could simply make Sanchou a full defendant by asserting that he either violated or aided or abetted a violation of the securities laws. The problem thus far is that the SEC has pursued each of these contradictory theories of recovery at once.

A "nominal defendant" is a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of litigation.[13] A nominal defendant holds the subject matter of the litigation "in a subordinate or possessory capacity as to which there is no dispute." *Colman v. Shimer*, 163 F.Supp. 347, 351 (W.D.Mich.1958) (quoting 2 J. Palmer, Cyclopedia of Federal Procedure, § 3.63 (3rd ed.)). Because the nominal defendant is a "trustee, agent, or depositary," *id.*, who has possession of the funds which are the subject of litigation, he must often be joined purely as a means of facilitating collection. The court needs to order the nominal defendant to turn over funds to the prevailing party when the dispute between the parties is resolved. A nominal defendant is not a real party in interest, however, because he has no interest in the subject matter litigated. His relation to the suit is merely incidental and "it is of no moment [to him] whether the one or the other side in [the] controversy succeed[s]." *Bacon v. Rives*, 106 U.S. 99, 104, 1 S.Ct. 3, 6, 27 L.Ed. 69. Because of the non-interested status of the nominal defendant, there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established. *Farmers' Bank v. Hayes*, 58 F.2d 34, 36 (6th Cir.1932).

---

obtained profits could be sought from a violator.

**11.** A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them. Courts have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities laws violations. See *Tcherepnin v. Franz*, 485 F.2d 1251 (7th Cir. 1973) (court has jurisdiction over receiver's actions to recover ill-gotten gains from non-parties), certiorari denied, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472; *SEC v. Wencke*, 783 F.2d 829 (9th Cir.1986) (same), certiorari denied, 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33. If the non-party has no ownership interest in the disputed assets, equitable relief can be sought from the non-party. See *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (as part of its equitable powers under the Securities Act of 1933, court can enjoin trustee from transferring funds belonging to company that violated Act).

The SEC may be trying to prove Sanchou's lack of ownership interest in his accounts by naming him in the complaint as a "nominal defendant." As we discuss *infra*, however, the SEC's mere assertion of Sanchou's nominal status cannot justify the entry of a freeze order. The injunction was properly issued against Sanchou only if the court on remand finds that the complaint's characterization of Sanchou as a "nominal" defendant is correct because Sanchou has no proper claim to his accounts.

**12.** Why the SEC did not try to attach the funds directly is a mystery. Fed.R.Civ.P. 64 makes available those remedies used to secure satisfaction of a judgment "in the circumstances and manner provided by the law of the state in which the district court is held." Before this Court the SEC argues that a constructive trust might be imposed in favor of the injured investors under Illinois state law. Apparently the viability of this option was not explored by the district court and thus will not be considered.

**13.** By definition a nominal defendant cannot be a "necessary" or "indispensable" party, as those terms are used in Fed.R.Civ.P. 19. See *Salem Trust Co. v. Manufacturers' Finance Co.*, 264 U.S. 182, 188–200, 44 S.Ct. 266, 266–71, 68 L.Ed. 628 (contrasting indispensable parties with mere nominal parties). A necessary party is one who "claims an interest relating to the subject of the action." Fed.R.Civ.P. 19(a). A nominal defendant, as will be explained, has no interest in the property that is the subject of the litigation.

We cannot deem the nature of Sanchou's interest in the funds in his accounts to be so subordinate that treatment of Sanchou as a nominal defendant is justified. The facts in the record on appeal are inconclusive. Some facts suggest that the funds in Sanchou's Quick & Reilly and First Chicago accounts are really Cherif's. Cherif had a power of attorney over each account. At the time he was trading, he used the accounts exclusively. His "industry" was the source of the funds added to the initial deposit.

Other facts, however, suggest that Sanchou's claim of title to the funds is not a sham and that Sanchou might even have helped Cherif to carry out his scheme. Sanchou supplied the $100,000 check used to open the Quick & Reilly account. On the day after the temporary restraining order was entered, Sanchou attempted to have the funds in the accounts wired overseas. These facts imply that it might be appropriate to name Sanchou outright as a defendant.

The district court's findings do not answer the question of whether Sanchou should be treated: 1) as a nominal defendant against whom the SEC need not assert an independent basis of subject matter jurisdiction; or 2) as a defendant against whom the SEC can or must bring a claim. The court first untenably suggested that Rule 19 supported the exercise of jurisdiction over Sanchou (R. Item 30 at 1) (Order Entering Preliminary Injunction as to Khaled Sanchou). The court also seemed to accept the theory that Sanchou himself is a wrongdoer, however, in spite of the fact that the SEC never formally alleged this. It found that "Sanchou, directly or indirectly, has made use of the means and instrumentalities of interstate commerce * * * in connection with the acts, practices, and courses of business described below [the alleged illegal trades]" (R. Item 30 at 3).

We will allow the injunction to remain in effect for 14 days so that Sanchou's and Cherif's respective rights in the accounts and Sanchou's party status can be sorted in an evidentiary hearing. Although we express no opinion as to what the finding of the district court may be, it seems from the facts adduced to this point that two outcomes are possible. If Sanchou's accounts were never meant to be anything but the means for Cherif to carry out his scheme,[14] the injunction is valid because Sanchou is properly termed a "nominal defendant." If Sanchou, as some of the facts suggest and as the district court seems to believe, is himself implicated in Cherif's scheme, the injunction must be vacated. The SEC would have to amend its complaint promptly to state a claim directly against Sanchou to recover the monies held in his accounts. It can then seek a new injunction under the amended complaint.

In any event, the SEC must take a stance on Sanchou's status. It cannot continue to name Sanchou as a "nominal defendant" to excuse itself from having to establish subject matter jurisdiction, while at the same time implying strongly that Sanchou is a violator of the securities laws. If Sanchou is a defendant, the district court should make him one. He will then be apprised of the nature of the allegations against him and can make use of the possible defenses available to him under the securities laws. Until now, Sanchou has been deprived of the use of what is arguably his money though no one has established either that

---

**14.** *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2nd Cir.1974), certiorari denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236, is instructive concerning the evidence that can be brought forth in an evidentiary hearing to support the issuance of an injunction against a non-party under 15 U.S.C. §§ 78u(d) and (e). In *Vesco*, the district court issued an injunction preventing Andean Credit Co., a non-defendant, from removing a yacht from its berth. Though Andean claimed title to the yacht, the plaintiff alleged that the yacht in fact was an asset of Robert Vesco, the defendant and insider trader.

The Second Circuit upheld the injunction after the plaintiff, in an evidentiary hearing, "made a sufficient showing of Vesco's interest in the yacht to sustain the injunctive relief granted." *Vesco*, 490 F.2d at 1355. Plaintiff demonstrated that Vesco and other defendants controlled Andean and may have been the actual source of the funds used to purchase the yacht, that Vesco and his family were the sole users of the yacht, and that Vesco had paid to refurbish the yacht. The court concluded, "One thing appears clear: Andean performed no function other than that of a mere nominee or shell." *Id.*

he is a wrongdoer or that the money simply is not his.

■ If the district court finds that Sanchou is a nominal defendant, the injunction can remain in effect because Sanchou's other challenges to the grant of the injunction are meritless.[15] Sanchou argues at length that he was never properly served with process in Tunisia and that he received inadequate notice of the May 31 preliminary injunction hearing at which he defaulted. We need not rule on the adequacy of service of process or notice in this case, however, because Sanchou waived the argument below.

It is axiomatic that a party waives a defense of insufficiency of process by failing to assert it seasonably in a motion or his first responsive pleading. Fed.R.Civ.P. 12(h)(1); *Giotis v. Apollo of Ozarks, Inc.*, 800 F.2d 660, 663 (7th Cir.1986), certiorari denied, 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158. Sanchou defaulted at the preliminary injunction hearing. Sanchou's first responsive pleading, a motion to amend the preliminary injunction, was filed on July 17, 1989. In this motion, Sanchou made no argument that he had not been timely served. In fact he himself invoked the jurisdiction of the court to ask for an order which would allow him to pay reasonable attorney's fees. In these circumstances, Sanchou's arguments regarding proper service of process and notice do not remain viable.

The injunction against Sanchou will remain in effect for 14 days so that the district court can hold an evidentiary hearing to determine the proper capacity in which Sanchou should be sued. If the court finds that he is a nominal defendant, the injunction was properly issued. If the court determines that Sanchou must be sued as a defendant, the complaint should be amended. The SEC can seek a new injunction invoking 15 U.S.C. §§ 78u(d) and (e) directly.

*Attorney's Fees*

■ Both Sanchou and Cherif sought modification of the preliminary injunctions entered against them in order to pay their respective attorney's fees. Cherif was permitted by the district court to withdraw $20,000 of the frozen funds to pay attorney's fees. Cherif argues that because he is a defendant in a pending criminal case, the injunction, which prevents him from withdrawing more funds, infringes his Sixth Amendment right to obtain counsel of his choice. Sanchou, for his part, claims that the Fifth Amendment due process clause ensures him access to funds that will enable him to retain counsel in his civil proceeding.[16] Cherif also contends that the district court's refusal to modify the injunction improperly "penalizes" him for invoking the Fifth Amendment and declining to provide an accounting. Sanchou and Cherif cite *Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir.1987), for the proposition that frozen fees should be released to the defendant in a civil case upon a showing that the defendant cannot pay for an attorney from exempt assets.

We review a district court's refusal to modify an injunction using an abuse of discretion standard, *Money Store, Inc. v. Harriscorp Finance Inc.*, 885 F.2d 369, 372 (7th Cir.1989), and find no abuse of discretion in this record. The recent Supreme Court cases of *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617,

---

**15.** Sanchou argues that the scope of the injunction must be modified even if it remains in effect after a finding that he acted as Cherif's nominee. We note initially that any funds which are found to be Sanchou's rather than Cherif's must be excluded from the freeze order. The district court may find, for example, that the initial $100,000 deposit was composed exclusively of Sanchou's funds. Funds in the accounts which are found to be Sanchou's only in name, however, can be frozen to satisfy a judgment against Cherif. The dollar figure of the assets frozen can include the amount of proceeds reasonably subject to disgorgement plus the amount which the SEC can recover as a civil penalty. *SEC v. Unifund SAL*, 910 F.2d 1028, 1041–1042 (2nd Cir.1990).

**16.** Sanchou cites *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1117 (5th Cir.1980), for the proposition that civil litigants have a right to counsel based in the Fifth Amendment due process clause (Br. 27). This Circuit has never adopted this ruling.

 

109 S.Ct. 2646, 105 L.Ed.2d 528, and *United States v. Monsanto*, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512, held that the use of frozen assets for attorney's fees could be disallowed in circumstances much more extreme than in *Dixon* or in this case. Both cases involved a criminal drug forfeiture statute, 21 U.S.C. § 853(e)(1)(A), which authorizes the forfeiture of property derived from or constituting proceeds from drug law violations. The Court held in *Caplin & Drysdale* that the Sixth Amendment right to counsel is not implicated when a district court refuses to release funds forfeited under the statute to allow a criminal defendant to pay attorney's fees. *Monsanto* held in addition that a defendant's assets may be frozen before conviction based on a finding of probable cause to believe the assets are forfeitable. *Monsanto*, 109 S.Ct. at 2665–2667.

Because this is a civil case, the arguments of Cherif and Sanchou are weaker than were those of *Caplin & Drysdale* or *Monsanto*. A criminal defendant has "no Sixth Amendment right to spend another person's money for services rendered by an attorney," *Caplin & Drysdale*, 109 S.Ct. at 2652. It would be anomalous to hold that a civil litigant has any superior right to counsel than one who stands accused of a crime. Cherif's reliance on his Fifth Amendment right to refuse to incriminate himself is also misplaced. The Fifth Amendment may be invoked in the civil context, but unlike a criminal case, the judge sitting in the civil proceeding can draw adverse inferences from the defendant's refusal to respond to probative evidence. *Baxter*, 425 U.S. at 318, 96 S.Ct. at 2633. Here the district court drew adverse inferences from the defendants' refusal to submit an accounting which would reveal which funds, if any, were not proceeds of the trading activity. We cannot say that the judge abused his discretion in doing so.

## CONCLUSION

For the foregoing reasons, the district court's grant of the injunction with respect to Cherif, and its refusal to modify the injunction, is affirmed. The case is re-manded with instructions, however, for further consideration of whether Sanchou properly can be enjoined and, if so, whether modification of the existing injunction to exclude non-proceeds is necessary.

Appellants' motion to strike matters from the SEC brief was taken with the case and is hereby denied.