*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0415p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SECURITIES AND EXCHANGE COMMISSION,

    *Plaintiff-Appellee,*

  *v.*

ALLEN GEORGE (03-3791); CARL E. JACKSON
(03-4472); FREDERICK D. HARRIS (03-4580;
04-3063); DERRICK MCKINNEY (03-4582);
RICK R. MALIZIA (03-4583); STEVEN E. THORN,
DURIETHA DZIORNY (03-4608),

    *Defendants/Relief*
    *Defendants-Appellants.*

Nos. 03-3791/4472/4580/4582/
4583/4608; 04-3063

> Appeal from the United States District Court
> for the Southern District of Ohio at Columbus.
> No. 01-00290—Edmund A. Sargus, Jr., District Judge.

Submitted: June 6, 2005

Decided and Filed: August 30, 2005[*]

Before: SILER and SUTTON, Circuit Judges; O'MEARA, District Judge.[**]

---

## COUNSEL

**ON BRIEF:** C. William Brownfield, Columbus, Ohio, for Appellants. Angel Yang, Susan S. McDonald, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Appellee. Allen George, Cleveland, Ohio, Carl E. Jackson, Highland Heights, Ohio, Frederick D. Harris, Cleveland Heights, Ohio, Derrick McKinney, Lewis Center, Ohio, Rick R. Malizia, Weston, Florida, Frederick D. Harris, Cleveland Heights, Ohio, pro se.

---

[*] This decision was originally issued as an "unpublished decision" filed on August 30, 2005. On October 6, 2005, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

SUTTON, Circuit Judge.   Steven Thorn, Derrick McKinney and Rick Malizia (the "defendants") appeal the district court's entry of summary judgment against them in this securities-fraud case.  They argue that numerous material fact disputes prohibited the district court (1) from imposing liability on them under several anti-fraud and unregistered-trading provisions of the federal securities laws and (2) from imposing a disgorgement remedy and several civil penalties on them. Durietha Dziorny, Allen George, Carl Jackson and Frederick Harris (the "relief defendants," so named because they profited from the defendants' scheme but did not facilitate it) also challenge the district court's entry of summary judgment, arguing that they should not be required to remit the entirety of their gains.  We affirm.

I.

In this civil-enforcement action, the Securities Exchange Commission (SEC) alleged that the defendants ran a Ponzi scheme.  With the assistance of Malizia and McKinney, Thorn raised $75.8 million from individuals in the United States and abroad that purportedly would be invested in a secretive European securities market.  As advertised by the defendants, the investment opportunity had all of the hallmarks of a "free lunch":  The investments would be virtually risk-free and would generate lucrative returns.  They also represented that the Federal Reserve Bank was involved in the investments and that the investments would benefit humanitarian projects.  As it turned out, the SEC alleged, the European market was not secretive; none of the money was ever invested in this market or any other; neither the Federal Reserve Bank nor any humanitarian project was involved in the programs; the only "returns" came from other individuals' initial investments; and the defendants took much of the other money (that was not used to pay fictitious returns) for their own use.

A.

The SEC showed that the defendants used two investment programs to commit the fraud.  The defendants started the first program, referred to as the "Global" or "GIG" program, in February 1998 and raised about $21.8 million under it through March 2001.   They started the second program, referred to as the "Financial Ventures" or "FV" program, in November 1999 and raised about $53.5 million under it through November 2000.  In both programs, the defendants told potential investors that their funds would be used to invest in, or finance the trading of, European fixed-instrument securities, including medium term notes.  Thorn represented that these securities, traded in secretive markets, could be bought at discounts by unidentified traders.  All three defendants represented that the investors' money would be pooled together to reach threshold levels for preferred rates of return.  And all three defendants represented that the investments would be risk free and that they would generate significant monthly returns.  Thorn and McKinney also represented that the Federal Reserve Board was involved in the programs, and Thorn added that a humanitarian project would benefit from the trading.  In the FV program, Thorn also told investors that the funds would remain in a United States bank, that the investors would retain control of the funds and that the funds would be used to "mirror" money at a European bank that would serve as collateral for the trader's line of credit.

The SEC also established that each of the defendants was more than a casual participant in the scheme.  Thorn testified that he was the sole owner and managing director of Global Investors, a company he formed in 1998, and the namesake of the GIG program.  He also created new entities to further the investment scheme, including First Financial Ventures (in 1999), Second Financial

Ventures (in 2000) and Third Financial Ventures (in 2000), the namesakes of the FV program. Thorn personally communicated with investors about the investment programs, and he received approximately $72 million from investors (including those recruited by Malizia and McKinney). For their parts, Malizia raised $2.4 million from 37 investors between September 1999 and March 2001, and McKinney raised $5.6 million from 116 investors between February 1999 and April 2001.

As it turns out and as the undisputed evidence showed, the defendants never used the investors' money to finance or trade in any security instrument. Instead, the FV investors' money, which was to remain segregated in individual investors' accounts, was swept from the deposit account into accounts in the name of Financial Ventures, which Thorn and his associate Stuart Rose controlled, and commingled with other investors' money. And the defendants used money invested in both the GIG and FV programs to pay purported profits to other investors or to make extravagant personal purchases. For example, as detailed in the declaration of Luz Aguillar, a senior SEC investigator:

> [O]n November 17, 2000, [one] Global Investors account . . . had a negative balance of approximately $6,953. From November 20, 2000 to December 8, 2000, Thorn deposited $1,494,655 from [two] [i]nvestors . . . into that account. Thorn used those funds as follows: (a) from November 27, 2000 to December 7, 2000, he paid $357,340 to seven investors; (b) from December 11, 2000 to February 28, 2001, he paid $726,445 to fifteen investors; (c) on December 11, 2000, he paid $61,500 to Cartier, Inc. to purchase a diamond ring; and (d) from December 28, 2000 to February 28, 2001, a total of $186,497 was used by Thorn for his benefit, including $50,000 in legal expenses, $80,000 transferred to his personal account at Key Bank, and [the] purchase of a $12,219 cashier's check to close the account; this cashier's [check] was cashed by Relief Defendant Durietha Dziorney [Thorn's fiancee].

JA 649. Altogether, Thorn spent $3.9 million on personal expenses, including $66,500 on a diamond ring, $362,853 toward a $1.1 million home, $93,989 on automobile lease payments, $221,000 on home furniture and $235,000 on legal expenses.

Malizia took a similar path. From September 1999 to March 2001, Malizia and RMAZ, a corporate entity through which he operated, raised $2.4 million from investors and sent $1.7 million of that money to Thorn. From June 1999 to March 2000, Malizia and RMAZ received about $1.4 million from Thorn and used $742,500 of that money to pay purported profits to various investors. He used $619,994 of the remaining $638,700 as follows: $183,500 for a check to himself and his then fiancee; $90,000 in gifts to his two brothers; $133,500 to an individual who had not invested in the scheme; $171,000 to a Third Financial Ventures account; and $41,994 for personal expenses including loan repayments.

So did McKinney. Through ITP, a corporate entity through which he operated, McKinney raised over $5.6 million from investors between February 1999 and April 2001, $4.2 million of which he sent to Thorn. McKinney used the remaining $1.4 million—as well as over $200,000 in unidentified deposits—as follows: $75,169 in cash withdrawals; $329,850 in payments to himself; $129,829 in various debit card purchases, mortgage payments and bank fees; $318,980 in payments to non-investor entities; $149,006 in checks to ITP; and $614,900 in transfers to unrelated ITP brokerage accounts, which was subsequently lost in domestic trading.

The SEC also introduced the expert testimony of Leonard Zawistowski, a Senior Special Investigator for the Federal Reserve, who explained that the defendants' investment programs contained many of the features of a Ponzi scheme:

(1) [T]he [d]efendants claim to invest in offshore jurisdictions; (2) the investments are allegedly made through the purchase of bank instruments with "blocked" funds; (3) the instruments are alleged to be traded at deep discounts to generate high yields; (4) the [d]efendants promise extraordinary returns to investors; (5) the [d]efendants claim involvement by the Federal Reserve in the purported trades; and (6) the [d]efendant[s] claim that the programs may involve some humanitarian project or goal.

D. Ct. Op. at 18 (summarizing SEC Exhibit 25).

All three of the defendants, the evidence also showed, were not securities-industry neophytes. Thorn was a stockbroker at Merrill Lynch and Morgan Stanley Dean Witter from March 1991 to November 1996. SEC Exhibit 3. Malizia was a registered representative at Merrill Lynch from October 1987 to May 1995 (when he met Thorn) and a Morgan Stanley branch office manager from 1995 to 1998. McKinney worked as a registered representative at Merrill Lynch from November 1991 to August 1992 (when he met Thorn) and as an insurance agent and stockbroker for Hamilton Investments, Linsco Private Ledger and Mutual Service Corporation from February 1994 to December 1999.

Despite this experience, Thorn never received any documents confirming that trading had occurred in the investment programs, and he never witnessed any trading. Instead of verifying the validity of the trading program, Thorn stated that he relied on information from associates and third parties to satisfy himself that the purported investment scheme was sound. Malizia and McKinney likewise concede that they never received any documents confirming purported trades. And while they both claimed to have made inquiries regarding the veracity of Thorn's investments, neither of them could provide details of those discussions.

B.

On April 2, 2001, the SEC filed its civil complaint against the three defendants, alleging fraud under the federal securities laws, *see* 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b); 15 U.S.C. § 78o(c)(1), 17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.15c1-2, as well as unregistered trading under 15 U.S.C. § 78o(a)(1). The district court granted the SEC's request to freeze the defendants' assets that same day. On October 14, 2003, the district court granted the SEC's motion for summary judgment, holding the three defendants liable under the anti-fraud and unregistered-trading provisions.

The district court also granted a permanent injunction against future trading, finding that the defendants had not acknowledged wrongdoing in their "egregious conduct" and that Thorn had violated the district court's orders on multiple occasions. D. Ct. Op. at 31. The district court ordered that Thorn disgorge $5,070,395 in misappropriated funds and pay $1,802,132 in prejudgment interest. The district court ordered Malizia to disgorge an amount to be determined after the receiver's final report, plus prejudgment interest. And it ordered McKinney to disgorge $1,434,757 in misappropriated funds and pay $294,632 in prejudgment interest. *Id.* at 33. Finally, the court found that "third tier" civil penalties in the amount of $100,000 each were appropriate for all three defendants, as the violations "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t, 78u; *see* D. Ct. Op. at 36.

C.

Roughly 550 people invested in the programs. Many investors lost substantial amounts of money, but 41 of them reported gains, amounting to approximately $3.8 million in overpayments from the defendants. After calculating the amount of money available to return to defrauded investors, the court-appointed receiver projected that the money remaining after the end of the program sufficed to permit investors to receive 42 percent of their original investments. To consolidate the remaining funds, the district court granted summary judgment to the SEC against a number of investors who received improper profits from Thorn and ordered them to disgorge their gains to the receiver. These investors, otherwise known as the relief defendants, included Durietha Dziorney, Carl Jackson, Frederick Harris and Allen George. D. Ct. Op. at 2, 36.

With respect to Dziorney, who is now Thorn's wife, the district court determined that Thorn spent investor funds when he bought her a 2.6 carat diamond engagement ring (worth $66,500) and when he gave her $18,800 to lease a Saab automobile and $14,119 for unspecified purposes. *Id.* at 42. Since she received these items from Thorn's ill-gotten gains and since she otherwise had no legitimate claim to them, the district court ordered that she disgorge both the ring and $32,919. *Id.* Jackson, who invested $285,000 with Thorn, received back $282,320 from Thorn, but the SEC traced those funds to contributions from other investors. Jackson did not dispute that the SEC had traced the $282,320 to the contributions of other investors, and accordingly the district court ordered Jackson to disgorge the ill-gotten gains plus $70,721 in prejudgment interest. *Id.* at 39. Harris invested $1,186,000 with Thorn and received $505,920 from him. Because the SEC traced the $505,920 to other investors' contributions and because Harris conceded that he did not know the source of the funds he received, *id.* at 38, the district court ordered that he disgorge $505,920 plus $139,867 in prejudgment interest, *id.* at 39. In a default judgment order, the district court similarly ordered another relief defendant, Allen George, to disgorge money. D. Ct. Op. (Apr. 28, 2003) at 2. George had invested $37,000 with the defendants and had received $79,300 in return, but George also presented no evidence identifying the source of the funds he received and admitted that the money could have come from other investors. Concluding that the $79,300 had been obtained illegally from other investors and that George had no legitimate claim to the money, the district court ordered him to disgorge $79,300 plus $13,495 in prejudgment interest. *Id.*

II.

A.

We review de novo the district court's entry of summary judgment. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Section 17(a) of the Securities Act of 1933 makes it unlawful for any person, directly or indirectly in the offer or sale of any securities:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act of 1934 makes it unlawful for any person, directly or indirectly:

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). And Rule 10b-5, promulgated under the authority of this statutory provision, makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To establish violations of these anti-fraud provisions, the SEC must show that the defendants engaged in (1) misrepresentations or omissions of material facts (2) made in connection with the offer, sale or purchase of securities (3) with scienter on the part of the defendants. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). A fact is material if a substantial likelihood exists that (1) a reasonable shareholder would consider the fact important in making his investment decision and (2) a reasonable shareholder would view the information as having significantly altered the total mix of information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Scienter may be established by proof of recklessness—"highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979).

Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1), prohibits a broker or dealer from using any manipulative or deceptive device, as defined in Rule 15c1-2, 17 C.F.R. § 240.15c1-2, to induce or attempt to induce the purchase or sale of any security. The elements of a § 15(c)(1) violation are the same as those for a violation of the anti-fraud provisions described above, with a similar scienter requirement that a statement be "made with knowledge or reasonable grounds to believe that it is untrue or misleading." 17 C.F.R. § 240.15c1-2(b).

Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), makes it "unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered [with the Commission]." *Id.*

B.

On appeal, the three defendants first challenge the district court's conclusions that the SEC produced sufficient evidence to establish as a matter of law each defendant's liability under the anti-fraud and unregistered trading provisions. Those arguments are best viewed in the context of the district court's reasoning with respect to each defendant and each violation.

As to Thorn, the district court reasoned:

> It is undisputed that Thorn represented to investors that their money would be used to purchase and trade in securities. No evidence has been adduced to support Thorn's position. The evidence of record shows that Thorn used investors' money to pay other investors as well as to support a seemingly lavish lifestyle for himself and his friends. [ ] Thorn's representation[] as to how investors' money would be used was clearly false and obviously material because it related to the very substance of the act of investing. In addition, the Court finds no genuine issue of material fact as to whether Thorn acted with the requisite scienter to establish violation of the anti-fraud provisions of the securities laws. Thorn's representations and actions were, at a minimum, reckless. Thorn and the other named [d]efendants worked for prominent brokerage firms, yet they represented to investors that incredible returns could be made, risk free, in a secretive European market . . . . Thorn failed to tell investors that a substantial portion of the investments would finance the extravagant living expenses of Thorn, his fiancee, and others.

D. Ct. Op. at 20. The district court also found Thorn liable under § 15(a)(1) and § 15(c)(1), as Thorn "solicited numerous investors to purchase securities in his offerings and held himself out as an intermediary between the investors and the purported trading programs." *Id.* at 28. Also, "Thorn received transaction-related compensation in the form of investors' money." *Id.* Given that it was uncontested that Thorn was not registered with the SEC, *id.* at 27, the district court found Thorn liable under § 15(a)(1). Finally, the district court repeated its finding that Thorn acted "at least recklessly" in his role in the scheme. *Id.* at 28.

> As to Malizia, the district court reasoned:

> In his testimony before the SEC, Malizia stated that Thorn told him that there would be no risk to principal on the investments and that profits could be expected. Malizia did not know where the money would be invested, other than it was to be in a foreign market, nor did he know why information about the purported investments was not available. Furthermore, Malizia received no documentation regarding the purported investments other than those which Thorn had him sign to participate in the program. Nevertheless, Malizia contributed money toward the investments and he solicited others to join in the purported investments offered by Thorn. Malizia also relayed any information Thorn gave him to others who put money into the programs through RMAZ. In addition, Malizia testified that he paid purported profits to investors, knowing that the same were not profits. Malizia paid investors with money from his account. . . .

> While Malizia contends that he truly believed Thorn and that he himself lost money in the purported trades, these facts do not controvert the evidence that Malizia encouraged people to invest in a program, the details of which he knew virtually nothing. In view of Malizia's former employment at several well-known brokerage firms, this Court has little trouble concluding that Malizia knew, or should have known[,] that Thorn's scheme was fraudulent. The Court therefore concludes that Malizia acted with the requisite scienter to establish liability under the anti-fraud provisions of the securities laws. Malizia's conduct in encouraging others to invest in Thorn's purported programs was, at a minimum, reckless for one with his past professional experience.

*Id.* at 24–25 (citations omitted). With respect to § 15(a)(1), the court concluded that Malizia solicited investors to purchase securities even though he was not registered with the SEC. With respect to § 15(c)(1), the court concluded that Malizia "at least acted recklessly" regardless of

whether he believed what Thorn told him about the scheme or whether Malizia himself invested money. *Id.* at 29.

As to McKinney, the district court reasoned:

McKinney concedes that he received money from investors, that he had no personal knowledge about the source of the payments he received from Thorn, and that he actually paid investors with other investors' money. Furthermore, McKinney testified on deposition that he informed investors that there was little or no risk to their principal because Thorn would invest the money in exempt European securities, United States treasury securities or overseas bonds. . . . [I]t is also undisputed that McKinney and his company, ITP, used at least $1.4 million of money they received from investors for their own purposes. . . .

Further, given McKinney's prior professional experience as a stockbroker and employment at a brokerage firm, there is no genuine issue of material fact that McKinney's conduct was at least reckless, so as to satisfy the scienter requirement.

*Id.* at 25–26 (citation omitted). As with the two other defendants, the district court also concluded that McKinney had acted as a broker or dealer while unregistered with the SEC, *id.* at 27, 29, in violation of § 15(a)(1), and acted at least recklessly, *id.* at 30, establishing liability under § 15(c)(1).

C.

In response to the district court's analysis of his claim, Thorn generally complains that the district court repeatedly used language in its facts section that the "SEC allege[d]" certain facts in the case, then argues that the district court relied only on the SEC's amended complaint to establish these facts. More specifically, he contends that the record contains no evidence to support the district court's statement that Thorn told GIG program investors that their funds would be transferred to an overseas bank where the money would serve as collateral for a line of credit. *See id.* at 2. But this statement is found within a series of introductory paragraphs laying out a summary of the SEC's allegations against the defendants. The district court supported this summary with pages of detailed factual development, citing documents admitted into evidence and testimony of experts, investigators and the defendants themselves. As to this particular fact, at any rate, Thorn's liability for securities fraud in this scheme does not turn on where he told GIG investors their money would be kept. In like manner, Thorn alleges that the district court relied on nothing more than the SEC's complaint when it stated that Thorn told investors that the investment was risk free and would generate significant monthly returns. Not true. The district court cited Thorn's own testimony and Malizia's and McKinney's depositions in which each of the defendants repeated these representations under oath. *See id.* at 4.

Second, Thorn alleges that the district court failed to examine his Second Accounting Disclosure before granting summary judgment, alleging that the document proves that he was engaged in a legitimate investment program. But Thorn does not dispute, nor make any reference to, the district court's November 5, 2003, order explaining that Thorn first made reference to the document in a "reply" memo—a filing that improperly gave Thorn the last word on the SEC's motion for summary judgment, that was filed just hours before the court granted summary judgment and that the district court did in fact examine before issuing its decision. Nor does Thorn offer any substantive explanation as to what it is within this document that proves he properly invested the money he received.

Third, Thorn relatedly takes issue with the district court's conclusion that he "produced no evidence of actual trading involving medium term notes." Thorn Br. at 29 (citing D. Ct. Op. at 20). He again claims that his Second Accounting Disclosure provides such evidence but again without any explanation as to how. Thorn adds that the district court "found no similarity between the common situation in which, for example, share owners in mutual funds never receive confirmation slips of specific trades the [f]und makes, as opposed to a [f]und [m]anager's quarterly summaries of the members' profits and losses, by category." Thorn Br. at 31. We, too, are unmoved by Thorn's analogy. As between a simple share owner and a fund manager, it is clear that Thorn more closely played the role of a fund manager. And a mutual fund manager assuredly could be expected to produce documentary records of the trades that the fund made in a given quarter.

Fourth, Thorn argues that the district court erred in finding no genuine issue of material fact as to the scienter element of these offenses. He asserts that he had no knowledge of any "unauthorized" investments in either the GIG program or the FV program, that he was simply one of several co-equal partners in the programs who had invested his own money. We have little difficulty deciding that no rational trier of fact would agree. Thorn admitted that he created and led the GIG program and the FV program. He alone authored several "Venture Updates" informing investors of the status of their investments based on information he had received from third parties yet had not verified. He knew that Malizia and McKinney were collecting investments from others for the FV program, he received money from them, and he gave them purported "profits" to distribute within their groups. Even if we were to accept Thorn's position that he was not aware of any "unauthorized" investors, moreover, Thorn does not deny that he induced investments from so-called "authorized" investors. Nor does he cite any authority for the proposition that one cannot victimize a co-equal business partner through securities fraud. And the district court correctly concluded that he acted at least recklessly—and therefore with the requisite scienter—when he failed to witness or receive any documentation confirming that securities had been traded and when he failed to verify the legitimacy of the investment programs he advertised. *See SEC v. Jakubowski*, 150 F.3d 675, 682 (7th Cir. 1998) ("Deliberate ignorance . . . is a form of knowledge."); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998) ("[R]eckless disregard of the truth satisfies the scienter requirements of [the anti-fraud provisions] when the defendant deliberately failed to acquire the information that would have indicated to her that her statements were false or misleading."). Neither does Thorn deny that he spent investor funds on personal expenses, a fact that itself establishes the requisite state of mind for committing securities fraud. *See Lowry v. SEC*, 340 F.3d 501, 506 (8th Cir. 2003); *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir. 2000).

Fifth, Thorn points to evidence that a market for European mid-term bank notes exists and that it bears similarities to the investment scheme he promoted. But even if everything Thorn says in this respect is true, it does not contradict the SEC's evidence that Thorn never invested the money he received in any market. That Thorn spent millions of investor dollars on personal expenses and that he has failed to establish any documentary evidence of trading in this market suffices to establish that, regardless of the reality of the underlying market, Thorn failed to invest money that he said he would invest.

Sixth, Thorn challenges the credibility of expert witness Leonard Zawistowski, who testified that the defendants' scheme matched the characteristics of a Ponzi scheme. Most of the specifics of the challenge, however, deal with details irrelevant to Zawistowski's ultimate conclusion, to say nothing of the ultimate outcome of the case against Thorn. Chief among these challenges is the already-addressed contention that European mid-term note markets do exist. Again, however, Thorn fails to prove that his advertised investment scheme existed and that he made any sort of investment at all. What is more, as the district court concluded, Thorn's challenges to the expert's testimony do not determine the outcome of the case. D. Ct. Op. at 18. Even in the absence of this testimony, sufficient evidence establishes all of the elements of securities fraud.

Seventh, Thorn argues that the "Venture Updates" authored by him cannot constitute fraud because he distributed them only to "authorized" investors who had already invested. Even if true, however, this contention does not affect the disposition of the summary judgment motion. As detailed above, the SEC produced sufficient evidence of the required elements without resorting to the language of the updates. The updates merely serve to bolster this evidence by showing the evasive method Thorn used to delay paying out profits and by showing that Thorn either knowingly made false statements or acted with recklessness in passing on false statements without independently checking them. What Thorn told the investors *after* they invested in this scheme, in other words, merely bolsters the SEC's evidence of what Thorn told them *before* they invested.

Eighth, Thorn argues that FV program investors could indeed control their own funds as they were swept into accounts "*only* for the purpose of verifying the consolidated funds to initiate the bank-to-bank credit verifications that would permit the Euro-MTN transactions they intended." Thorn Br. at 37. To support this assertion, Thorn cites his own deposition testimony that these funds could be used as collateral for a line of credit in Europe without removing them from the American bank or from the control of individual investors. But as Aguillar's declaration sufficiently establishes through bank record analysis, this statement by Thorn was part of the fraudulent device. Other than one unexplained reference to Rose's testimony, Thorn offers nothing more to contest Aguillar's analysis of the bank records. In the face of this testimony and the other undisputed evidence in the record, Thorn has not created a material fact dispute.

D.

For his part, Malizia first argues, without citing any record evidence, that he formed RMAZ only to pool money from close family members and friends and that he did not know that these people in turn were recruiting other investors. But Malizia produces no evidence to support this position. And, of course, Malizia could have produced testimony along these lines from these individuals but apparently chose not to do so. His own denial of the allegation does not suffice by itself to create a material fact dispute.

Second, Malizia takes on the district court's conclusions that no money was invested and that he spent some of the money on personal expenses. After purporting to recount the details of his own transactions—with nary a single citation to the record—he states that he never knew that Thorn was not investing the money, that Thorn told him that the $1.4 million Malizia received was legitimate investment profit and that Malizia personally suffered a net deficit in the scheme. Yet none of these defenses, whether factually accurately or not, makes a difference to Malizia's appeal. As the district court correctly concluded and as Malizia nowhere contests, his scienter was established through his failure independently to verify the legitimacy of the scheme. Malizia further claims that he did not pass on illegitimate profits to RMAZ investors but rather bought out those investors. But the only record evidence he cites to support this position is a list of RMAZ payees, a list that does not counter the charge of illegitimate profit payments and does not explain why some investors were receiving money traceable to others' investments. Malizia also asserts that he used his own salary to pay for the personal expenses. But again he offers no record evidence to contest the SEC's proof that he used funds traceable to other peoples' investments to pay for these personal expenses.

Third, Malizia makes a general argument that the SEC lumped the defendants together without specific evidence as to the liability of each of them individually. But as detailed above, the SEC provided sufficient evidence to establish all of the securities-fraud elements for each of the defendants individually. That the district court summarized this evidence at times by referring to the defendants collectively does not undermine the sufficiency of the evidence as to each of them individually.

Finally, Malizia contends that he was not a broker under § 15(a)(1). A "broker," however, is defined as "any person engaged in the business of effecting transactions in securities for the accounts of others." 15 U.S.C. § 78c(a)(4)(A). And the district court correctly referred to several factors that may qualify an individual as a broker (none of which Malizia contests), including regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, involvement in advice to investors and active recruitment of investors. D. Ct. Op. at 27–28 (citing *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984), and *SEC v. National Executive Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980)). Malizia argues only that he was not employed by the issuer of the securities and that, because he ultimately suffered a net loss in the scheme, he did not receive compensation for his work. Even if we accept both arguments, they do not suffice to counter the SEC's proof that Malizia was regularly involved in communications with and recruitment of investors for the purchase of securities. *See, e.g.*, *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998) (finding defendants acted as brokers when they together solicited 40 investors and received a total of $1.7 million in investments).

E.

In addition to raising many of the same challenges raised by Thorn (and rejected above), McKinney repeatedly asserts that he was unaware that the scheme was illegitimate and that he believed that the money Thorn distributed to him amounted to legitimate profits from investments. But like Malizia, McKinney cites no record evidence to create a genuine issue of material fact on this score, and he does not contest the district court's conclusion that his failure to investigate the veracity of the program sufficed to establish scienter.

Second, McKinney challenges his liability under § 15(a)(1), contending that he never "sold securities" because Thorn controlled the scheme and because McKinney merely acted as an intermediary. The undisputed evidence, however, contradicts both premises of this argument, as we have shown above.

III.

The relief defendants also challenge the disgorgement orders. Their challenges, likewise, are unavailing.

A relief defendant (sometimes referred to as a nominal defendant) may "be joined to aid the recovery of relief" and "has no ownership interest in the property which is the subject of litigation." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991); *see also SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). "Federal courts may order equitable relief against [such] a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Cavanagh*, 155 F.3d at 136; *see also Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).

Each of the relief defendants in this instance received ill-gotten funds and had no legitimate claim to those funds. The pricey diamond ring and the $32,000 that Dziorney received from Thorn came from funds Thorn received from investors. Because Thorn obtained the money through fraud, then gave it to Dziorney as a gift, she has no legitimate claim to the funds. To hold otherwise "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds[] by the simple procedure of giving [the proceeds] to friends and relatives, without even their knowledge." *Cavanagh*, 155 F.3d at 137.

Jackson, Harris and George also received ill-gotten funds from the defendants. While each of the three invested his own money in Thorn's investment scheme, the SEC showed that the money they received from the scheme came not from profits on their investments but from the investments of others. Each of these relief defendants fails to rebut this evidence. Before the district court, Jackson came "forward with no evidence to refute the SEC's evidence that the amount Jackson received as purported profits came from other investors." D. Ct. Op. at 39–40. Jackson now claims in his briefs that the money he received back was "clearly traceable to him," Jackson Br. at 13, but he fails to identify anything in the record that supports this assertion. Matters are worse for Harris: Not only does he fail to present any evidence rebutting the SEC's proof of tracing, but he also has "concede[d] that he does not know the source of the funds" he received from Thorn. D. Ct. Op. at 38. And George, who received back more money than he contributed to the investment pool and so cannot claim he received only his own funds back, has also failed to come forward with any evidence rebutting the SEC's tracing evidence. To survive summary judgment in the face of the SEC's evidence, the relief defendants needed to present affirmative evidence, not just affirmative assertions, demonstrating a disputed issue of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). They did not do so.

Trying a different tack, Jackson, Harris and George contend that the amount of money they invested in the scheme should be subtracted from the amount they have been ordered to disgorge. Not true. Hundreds of other investors were victimized by this scheme, yet they will recover only 42 percent of the money they invested, not the 100 percent to which the relief defendants claim to be entitled. The mere coincidence that the defendants chose the relief defendants (instead of others) to receive funds contributed by other investors in order to delay the discovery of this scheme does not entitle the relief defendants to preferential treatment. *See SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (noting that "the facts did not support a remedy that would elevate the [relief defendants'] claim above the other victims" even though the relief defendants *could* trace the funds they received to a segregated account containing only their investment). As the Second Circuit has noted, "the use of a *pro rata* distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme,' in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002); *id.* ("In such a scheme, whether at any given moment a particular customer's assets are traceable is a result of the merely fortuitous fact that the defrauders spent the money of the other victims first."). As the Supreme Court explained in the litigation that gave the Ponzi scheme its name, "equality is equity" as between "equally innocent victims." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (ordering pro rata distribution in bankruptcy proceedings resulting from Charles Ponzi's fraud). Under these circumstances, Jackson, Harris and George may not receive a disproportionate share of the recovered investor funds, only the same pro rata share that other investors may receive.

Harris and Jackson next contend that their position differs from that of traditional relief defendants because here they always retained control of their accounts. Harris Br. at 17; Jackson Br. at 14. "A Ponzi scheme," Harris asserts, is "impossible" under such circumstances. Harris Br. at 17. Unfortunately for Harris and Jackson (and for the hundreds of other defrauded investors), the record shows that Thorn, despite his representations to the investors, did control the subordinate accounts (called "zero-balance accounts") created for individual investors underneath his main Financial Ventures accounts (called the "concentration accounts"). The SEC's evidence shows that funds deposited into Bank One accounts (like Harris's funds) "were swept into the Financial Ventures accounts at Bank One controlled by Thorn." JA 461, 646. Craig Morgan, the Bank One vice-president who set up the system of accounts, testified that Thorn had withdrawal rights to the main account because he was the acting member of the limited liability company that set up the accounts. The signature cards for the various accounts also bear Thorn's name, and the record is replete with evidence that Thorn and one of his associates, Stuart Rose, controlled those accounts.

*See* JA 535 ("BANK ONE is hereby authorized to make payments from the Account upon and according to the check, draft, note or acceptance of [First Financial Ventures], signed by Steve Thorn."); JA 545 ("Stuart Rose . . . shall have sole signatory power on behalf of the company for the placement of funds held at Bank One . . . in the amount of [$11 million]" in a certain Financial Ventures account). Attempting to respond to this evidence, Harris invokes three letters written by Thorn and sent to Morgan, the Bank One vice-president, that appear to relinquish Thorn's withdrawal rights to the accounts. *See* Resp. to Order to Continue Asset Freeze (D. Ct. Docket No. 104), Ex. 16–18. In each of these letters, Thorn requests a hold on the account and purports to "waiv[e] any right to withdraw, remove or transfer funds" from the subordinate zero-balance accounts. *Id.* Morgan told Thorn, however, that the hold requests were not enforceable by Bank One and that the requests could not be fulfilled without additional steps, steps never taken by Thorn. Harris and Jackson, in short, have not shown that they had exclusive control over their accounts and therefore have failed to establish a material fact dispute over whether they had a legitimate claim to the funds. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989).

The relief defendants present over 20 additional arguments, none of which are meritorious. For example, Harris asserts that the district court lacked subject matter jurisdiction over the relief defendants. But as explained above, a relief defendant is a person with "no ownership interest in the property which is the subject of litigation;" accordingly, "once jurisdiction over the defendant is established," the court gains jurisdiction over the relief defendants as well. *Cherif*, 933 F.2d at 414. George claims that he was not properly served with the second amended complaint, but the record shows that he was served the day after the second amended complaint was filed. Harris challenges the district court's denial of his motion to compel the SEC to dissolve the asset freeze, arguing that the SEC failed to produce sufficient evidence tracing the money he had received. The district court held the motion in abeyance, however, and as the proceedings progressed the SEC produced sufficient evidence to merit the district court's eventual denial of the motion. Harris alleges that the SEC violated the equal-protection guarantees of the Fourteenth Amendment by naming him (and not others) as a relief defendant, *see* Harris Br. at 23–27, but he fails to cite any case law or make any sustained argument in support of this "class of one" equal-protection claim. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

IV.

The remaining arguments raised by the defendants and relief defendants either have already been addressed in this opinion, are waived because they have been only perfunctorily raised on appeal, are waived because they were not raised below or have been adequately addressed by the district court in its thorough opinions in this case.

V.

For these reasons, we affirm.