322 F.3d 1123
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
John A. HICKEY, Defendant-Appellant, and
Mamie Tang, Continental Capital Financial Group, Inc.; Continental Capital Income Fund II; JM Regional, Inc.; Continental Capital Properties I, Inc.; Continental Capital Securities Group, Inc.; Continental Capital Investments, Inc.; Continental Capital Employees, Inc.; Continental Capital Secured Principal with Income Fund I; Continental Capital Private Equity Fund I; D.E. Frey & Company, Inc., Defendants.
Securities and Exchange Commission, Plaintiff-Appellee,
v.
John A. Hickey, Defendant, and
John Hickey Brokerage, Third-Party Appellant.
 No. 01-17027.
 No. 01-17214.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 5, 2002.
 Filed March 7, 2003.
 
 David J. Cohen, Cohen & Paik, San Francisco, CA, for defendant-appellant, John A. Hickey.
 Curtis F. Dowling, Dillingham & Murphy LLP, San Francisco, CA, for third-party appellant, John Hickey Brokerage Co.
 Michael A. Conley and Rada Potts, Securities and Exchange Commission, Washington, DC, for plaintiff-appellee, Securities and Exchange Commission.
 Appeals from the United States District Court for the Northern District of California; William H. Alsup, District Judge, Presiding. D.C. No. CV-94-03336-WHA.
 Before HAWKINS, GRABER, and TALLMAN, Circuit Judges.
 OPINION
 TALLMAN, Circuit Judge.
 
 
 1
 This case presents us with the important and intriguing question of when a court may freeze assets of a nonparty to effectuate relief granted in a securities fraud enforcement action. We conclude that the inherent equitable power of a district court allows it to freeze the assets of a nonparty when that nonparty is dominated and controlled by a defendant against whom relief has been obtained in a securities fraud enforcement action.
 
 
 2
 * These consolidated appeals arise from a scheme that defrauded investors in a limited partnership of $15 million. Legal proceedings began in September 1994 when the Securities and Exchange Commission ("SEC") filed a complaint against John Hickey, Mamie Tang, and several corporate entities controlled by Hickey and Tang. This matter has traveled a long and winding path since 1994, and the trail continues to lengthen as Hickey is currently awaiting trial on a related federal criminal indictment.
 
 
 3
 Hickey and Tang collected money from investors by promising to develop property in California's Napa and Sonoma Valleys. The SEC complaint alleged that Hickey and Tang offered unregistered limited partnerships in Continental Capital Income Fund II ("Continental"), promising that the partnership would commercially develop the wine country lands. In doing so, Hickey and Tang violated federal securities laws. In particular, they illegally offered for sale unregistered securities and made material misrepresentations in the prospectus distributed to investors. The material misrepresentations included false statements about their net worth (which was supposed to secure the investments) and the status of title to the California property.
 
 
 4
 On the day the complaint was filed, the district court appointed a receiver to assume control of Continental. On December 2, 1994, the district court entered a default judgment against Hickey when he failed to timely answer the complaint. In February 1995, the default was vacated when Hickey and the SEC entered into a consent decree. In the consent decree, Hickey admitted violating securities laws and pledged that he "shall not assert" that he did not violate federal securities laws if the SEC sought disgorgement in the future.
 
 
 5
 The SEC's pursuit of Hickey by civil means stalled while the parallel criminal investigation commenced. On October 21, 1999, the SEC finally moved for summary judgment against Hickey on the disgorgement issue. In a written order filed on February 18, 2000, the district court granted the SEC's motion for summary judgment and ordered Hickey to disgorge $1.1 million. The court retained jurisdiction "for the purpose of enforcing its judgment, including approval of any distribution plan for the investors."
 
 
 6
 Hickey failed to disgorge any of his unlawful gains. On April 24, 2001, the SEC moved for an order directing Hickey to show cause why he should not be held in contempt. The district court granted the motion and set a hearing on the order to show cause.
 
 
 7
 The court held a two-day contempt hearing. The SEC presented evidence that Hickey had failed to satisfy the clear disgorgement order. The court agreed with the SEC's prima facie argument, holding "that the S.E.C. has carried that burden and shown that not one penny has been paid by Mr. Hickey under the February 2000 order as amended or prior thereto." The court then stated that "the burden has shifted under the law to Mr. Hickey to demonstrate why he was unable to comply with the order." Hickey and the SEC quarreled at the hearing over whether the assets of the John Hickey Brokerage Co. ("Brokerage") — a Bay Area real estate brokerage, which was owned by Hickey's mother, Dorothy Hickey, and founded after the SEC filed its complaint — should be considered available to Hickey as means to satisfy the disgorgement order.
 
 
 8
 The district court thought that it was entitled to hold Hickey in contempt at the hearing, but decided that it would not "do that at this moment." Instead, the court stated that it "want[ed] to bend over backwards to make sure that Mr. Hickey has the procedural due process that anyone could possibly argue for" and, accordingly, set another hearing for August 2001 to address the "[B]rokerage's ability to pay and, in turn, Mr. Hickey's derivative ability to pay," including whether the Brokerage was in fact Hickey's alter ego.
 
 
 9
 The court also directed Hickey to conduct discovery and disclose a list of witnesses for the August 2001 hearing. In the interim, the SEC deposed Dorothy Hickey to explore John Hickey's control of the Brokerage. Yet, John Hickey failed to conduct any discovery during this time and did not produce any witness list for the August 2001 hearing.
 
 
 10
 On August 10, and again on August 22, 2001, the district court considered evidence and heard oral argument on the issues of Hickey's ability to pay the disgorgement amount and Hickey's relationship with the Brokerage. Hickey presented no evidence establishing his inability to pay the disgorgement. Nonetheless, the district court allowed Hickey's counsel to designate portions of the deposition of Dorothy Hickey for consideration by the court.
 
 
 11
 The SEC designated portions of depositions from two witnesses and called four live witnesses to testify about the workings of the Brokerage. The SEC's evidence included Hickey's employment agreement with the Brokerage, which provided that the Brokerage would pay "[a]ll business and/or personal expenses [incurred by Hickey] as deemed appropriate by [Hickey] ... whether or not business related and any and all other expenses as deemed appropriate by [Hickey]." Dorothy Hickey, John's elderly mother residing in Chicago and the nominal owner of the Brokerage, testified by deposition that "I assigned all — anything, any questioning or any running of the business to John. I didn't cope with it." Other witnesses testified that the Brokerage was a profitable business with several hundred thousand dollars in cash on hand. The SEC demonstrated that Dorothy Hickey delegated the day-to-day operations of the Brokerage to Hickey, to the point where Hickey literally used a rubber stamp with the owner's signature to validate documents requiring an owner's signature. Evidence was also adduced that John Hickey registered with the California Department of Real Estate as the Brokerage's "administrative manager" and "designated broker." Neither Hickey nor the Brokerage rebutted the SEC's evidence concerning John Hickey's absolute control over the Brokerage.
 
 
 12
 On September 7, 2001, the district court issued an order holding John Hickey in contempt and freezing the Brokerage's assets. The court found that Hickey had access to the Brokerage's assets by virtue of his unqualified right to use Brokerage funds for his personal expenses. The court also found that Hickey was the true controller of the Brokerage and that the nominal owner "never exercised any meaningful supervision." The district court's order froze the Brokerage's assets, but allowed the Brokerage to pay rent, utilities, wages, and insurance without limitation. The order required the Brokerage to secure the SEC's permission for the payment of other business expenses.
 
 
 13
 The district court's order also set a payment schedule for Hickey. The schedule required Hickey to pay $20,000 per month for the remaining three months of 2001 and $40,000 per month thereafter. The court stated that "Mr. Hickey is being given the opportunity to purge himself over the next three months, failing which he must report for custody."
 
 
 14
 Both Hickey and the Brokerage filed timely notices of appeal of the contempt order and asset freeze.
 
 II
 
 15
 The SEC contends that we lack jurisdiction over Hickey's appeal related to the contempt order entered on September 7, 2001. "Orders of civil contempt entered against a party during the course of a pending civil action are not appealable until final judgment." SEC v. Elmas Trading Corp., 824 F.2d 732 (9th Cir.1987). Even if the underlying action has proceeded to a final judgment, "an adjudication of civil contempt is not appealable until sanctions have been imposed." Donovan v. Mazzola, 761 F.2d 1411, 1417 (9th Cir. 1985) (emphasis added).
 
 
 16
 Here, the district court never imposed sanctions pursuant to its contempt order, and Hickey appealed before the end of the period during which he could purge the contempt. The district court's contempt order provided Hickey an opportunity to purge himself if he made three payments of $20,000 by the end of 2001. Hickey appealed the contempt order on October 1, 2001, long before the expiration of the period in which he could purge himself of contempt. We therefore dismiss Hickey's appeal for lack of jurisdiction for the reasons urged by the SEC.
 
 
 17
 In addition, Hickey did in fact purge himself of contempt by making the required payments, and the district court entered an order on December 21, 2001, stating that Hickey "has therefore purged himself of the contempt." Even if we had jurisdiction over Hickey's appeal initially, that appeal is now moot. See Thomassen v. United States, 835 F.2d 727, 731 (9th Cir.1987) (recognizing that "the purging of the contempt ordinarily renders the controversy moot").
 
 III
 
 18
 The Brokerage argues that the district court abused its discretion when it froze the Brokerage's assets. District courts have broad equitable power to order appropriate relief in civil contempt proceedings. McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949). We therefore review the court's exercise of that power for an abuse of discretion. Peterson v. Highland Music, Inc., 140 F.3d 1313, 1323 (9th Cir. 1998).[1]
 
 
 19
 * The Brokerage argues that the district court abused its discretion because the Brokerage is not Hickey's "alter ego," as that concept is defined in California law, and a court may not engage in "reverse piercing" in the absence of an alter ego relationship. The Brokerage is correct that it is not Hickey's alter ego under California law. But the Brokerage is incorrect that the district court abused its discretion, because the district court never engaged in any type of "piercing" that required an alter ego relationship.
 
 
 20
 * "We apply the law of the forum state in determining whether a corporation is an alter ego" of an individual. Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1391 (9th Cir.1993). We have previously determined that California law recognizes an alter ego relationship, such that a corporation's liabilities may be imposed on an individual, only when two conditions are met: (1) "`there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased,'" and (2) "`an adherence to the fiction of the separate existence of the corporation would ... sanction a fraud or promote injustice.'" Firstmark Capital Corp. v. Hempel Fin. Corp., 859 F.2d 92, 94 (9th Cir.1988) (quoting Wood v. Elling Corp., 20 Cal.3d 353, 142 Cal.Rptr. 696, 572 P.2d 755, 761-62 n. 9 (1977)).
 
 
 21
 It is the first of these requirements that merits discussion here. However much control Hickey may have over the Brokerage, he does not own any part of the Brokerage. According to the SEC, an individual need not own any part of a corporation for an alter ego relationship to exist.
 
 
 22
 We disagree with the SEC's argument. Ownership is a prerequisite to alter ego liability, and not a mere "factor" or "guideline." Many California courts have stated that "[t]here is no litmus test" for the existence of an alter ego relationship. Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 216 Cal.Rptr. 443, 702 P.2d 601, 606 (1985); see also Automotriz Del Golfo De Cal. S.A. v. Resnick, 47 Cal.2d 792, 306 P.2d 1, 3 (1957) (stating that "conditions under which a corporate entity may be disregarded vary according to the circumstances in each case"); Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523, 539, 99 Cal.Rptr.2d 824 (2000) (stating that "the courts must look at all the circumstances to determine whether the doctrine should be applied"); Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235 Cal.App.3d 1220, 1248, 1 Cal.Rptr.2d 301 (1991) (stating that "the conditions under which a corporate entity may be disregarded vary") (internal quotation marks omitted). But these courts also state that "[t]here are, nevertheless, two general requirements": ownership and the specter of fraud. Mesler, 216 Cal.Rptr. 443, 702 P.2d at 606; see also Automotriz, 306 P.2d at 3 (there are "two requirements for application of this doctrine"); Sonora Diamond, 83 Cal. App.4th at 538, 99 Cal.Rptr.2d 824 ("In California, two conditions must be met before the alter ego doctrine will be invoked...."); Las Palmas, 235 Cal.App.3d at 1249, 1 Cal.Rptr.2d 301 (there are "two requirements for application of this doctrine") (internal quotation marks omitted).
 
 
 23
 Aside from these broad statements, the teeth of the ownership requirement are shown by several California cases that turned on the fact that an individual had no ownership interest in the corporation. For example, in Riddle v. Leuschner, 51 Cal.2d 574, 335 P.2d 107 (1959), a plaintiff filed a breach of contract action against two corporations that processed fruit and vegetables. The plaintiff argued that the Leuschners, the family that controlled the corporations, were the alter ego of the corporations and should have been personally liable for the corporations' debts. Id. at 108. Mrs. Leuschner and Leuschner, Jr. owned the corporations. Id. at 111. But Mr. Leuschner did not own a single share of the corporations, although he was the "managing employee of the two companies, and his control over their affairs must be treated as that which would be exercised by a managing agent." Id. Because Mr. Leuschner "held none of the stock," the first requirement of an alter ego relationship was not met. Id. On the other hand, Mrs. Leuschner and Leuschner, Jr. owned shares of the corporations and, therefore, satisfied the alter ego test. Id. The finding of alter ego as to Mrs. Leuschner was based on her ownership of only a single share of stock in one of the corporations. Id. The distinctions made as to the Leuschners make sense only if ownership of stock is an absolute requirement for an alter ego finding.
 
 
 24
 Like the Riddle court, we have previously concluded that ownership in a corporation is a necessary element for the application of the alter ego doctrine under California law. In Firstmark Capital, a plaintiff attempted to reach the assets of the wife of the owner of a corporation in order to satisfy a judgment against the corporation. 859 F.2d at 92-93. The wife did not own any shares in the corporation, but did have a community property interest in her husband's shares. Id. at 94. In evaluating whether the wife could be deemed an alter ego of the corporation under California law, we stated that "[o]wnership of an interest in the corporation is an essential part of the element of unity of ownership and interest. If an individual's ownership is not established, the corporation's obligations cannot be imposed on him or her." Id. (emphasis added). We also stated that ownership of stock is "a threshold question under California's alter ego doctrine." Id. We concluded that the wife's "community property interest in [her husband's] stock holdings ... is sufficient to satisfy the ownership requirement." Id. Riddle and Firstmark Capital establish that an individual must own at least a portion of a corporation before an alter ego relationship is deemed to exist under California law. The cases cited by the SEC do not alter our conclusion. The SEC cites Century Hotels v. United States, 952 F.2d 107, 110-11 (5th Cir.1992), for the proposition that lack of ownership "is a factor [in determining alter ego status], but it does not preclude the finding of alter ego when control is otherwise established." Although this holding would support the SEC's argument if it were relevant, the Century Hotels court applied a mix of Louisiana state law and Fifth Circuit precedent to fashion a test for when an alter ego relationship exists. In this case, we are faced with a clear rule of law established by the California courts that an individual must own at least part of a corporation for an alter ego relationship to exist. The Fifth Circuit's interpretation of its law, and the law of Louisiana, is not instructive.
 
 
 25
 The SEC suggests that we have already bootstrapped the Century Hotels holding into our Circuit by citing to Century Hotels in our decision in Towe Antique, 999 F.2d at 1390. However, Towe Antique cites Century Hotels only to recognize that "other courts have permitted the use of a `reverse piercing' theory." Id. But Towe Antique goes on to state that "Montana law is applicable." Id. at 1391. Because Montana law controlled in Towe Antique, the alter ego test stated in that case is, again, irrelevant to our inquiry. And because Towe Antique mandates that California law apply to this case, see id., we are back to considering whether the Brokerage was Hickey's alter ego under California law.
 
 
 26
 Because an individual must own at least a portion of a corporation before an alter ego relationship exists under California law, the Brokerage is not Hickey's alter ego. Hickey does not own any part of the Brokerage, and the SEC has not tried to show otherwise.
 
 2
 
 27
 The lack of an alter ego relationship between Hickey and the Brokerage does not mean that the district court abused its discretion in freezing the Brokerage's assets. The existence of an alter ego relationship is necessary only when some type of "piercing" is sought. The district court did not "pierce" the Brokerage when it froze its assets.
 
 
 28
 "Reverse piercing" is a method of holding a corporation liable for the debts of a shareholder. See id. at 1390; see also 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 41.70 (reverse piercing is a device used "to satisfy the debt of an individual out of corporate assets"). When a court engages in reverse piercing, it imposes liability directly on a corporation. This idea of holding one entity liable for the debts of another flows from the traditional piercing theory, in which a shareholder is saddled with the debts of a corporation. In describing the nature of piercing the corporate veil, the California Supreme Court has stated that "[i]n certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." Mesler, 216 Cal.Rptr. 443, 702 P.2d at 606 (emphasis added); see also Fletcher § 41 ("there are some circumstances under which the corporate entity will be disregarded and liability imposed upon its members") (emphasis added).
 
 
 29
 The thrust of "piercing" is the imposition of direct liability. The district court did not hold the Brokerage liable for Hickey's disgorgement obligation or contempt payments. In other words, the district court did not order the Brokerage to pay Hickey's obligations. Instead, the district court froze the assets of the Brokerage. An asset freeze is not an imposition of liability requiring an alter ego relationship. Under the terms of the freeze order, legitimate corporate business expenses may be paid from frozen assets unless the SEC objects and brings the basis for its objection to the attention of the district court.
 
 B
 
 30
 Even though the district court's asset freeze did not depend upon an alter ego relationship between Hickey and the Brokerage, the question remains whether the district court was authorized to freeze the Brokerage's assets. We conclude that the district court's broad equitable powers, drawn from a tradition of allowing courts to reach third parties in order to effect orders in securities fraud enforcement actions, authorized the asset freeze.
 
 
 31
 "We do not think that state law limitations on the alter ego theory or doctrine are necessarily controlling in determining the permitted scope of remedial orders under federal regulatory statutes." Sebastopol Meat Co. v. Sec'y of Agric., 440 F.2d 983, 985 (9th Cir.1971). Instead, "federal courts have inherent equitable authority to issue a variety of `ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." SEC v. Wencke, 622 F.2d 1363, 1369 (9th Cir. 1980).
 
 
 32
 Wencke illustrates the scope of a district court's authority to fashion ancillary relief in securities cases. In that case, the district court issued a stay that prevented nonparties from initiating litigation against an entity in receivership. Id. at 1367. One of the nonparties appealed, arguing that the district court was without authority to constrain the behavior of a nonparty that was never accused of violating securities laws or harboring ill-gotten gains. Id. We rejected this argument. In defining the source of a district court's authority, we stated:
 
 
 33
 The power of a district court to ... grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief.
 
 
 34
 Id. at 1369. Later, we stated that "[t]he Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest." Id. at 1371 (emphasis added). We concluded that the district court was authorized to restrain the nonparty. Id. at 1372. But we went on to analyze the necessity for the stay, indicating that the exercise of the district court's broad power to fashion ancillary relief could be exercised only where necessary. Id. We held that the district court's restriction on the nonparty was necessary to effectuate the relief already ordered by the court. Id. at 1372-75.
 
 
 35
 The district court in this case was authorized to freeze the assets of the Brokerage, so long as doing so was necessary to protect and give life to the disgorgement and contempt orders already entered against Hickey. See id. at 1371. The necessity of the district court's asset freeze is demonstrated by the total and complete control that Hickey exercised over the Brokerage, and by the fact that Hickey's only source of income was the money that he ordered paid to himself through the Brokerage from the assets frozen by the court's order. That Hickey may have been clever enough to organize a completely separate, successful entity, and construct a unique employment compensation agreement covering all of his personal expenses using corporate assets, does not put him beyond the reach of a court's powers of disgorgement.
 
 
 36
 As we noted earlier, the SEC demonstrated that Hickey had unfettered control of the Brokerage. Hickey's employment agreement with the Brokerage allowed him to pay whatever personal expenses he deemed appropriate. Dorothy Hickey, the nominal owner of the Brokerage, testified that she delegated the day-to-day operations of the Brokerage to Hickey, to the point where Hickey used a rubber stamp with the owner's signature. Finally, Hickey registered with the California Department of Real Estate as the Brokerage's "administrative manager" and "designated broker."
 
 
 37
 Given Hickey's dominance of the Brokerage, freezing the Brokerage's assets was necessary for the district court to guarantee that its disgorgement order would be satisfied and that Hickey would honor the payment schedule established in the contempt order. The district court acted within its discretion by invoking its equitable powers to freeze the Brokerage's assets.
 
 
 38
 Our analysis is not changed by the Seventh Circuit's decision in SEC v. Cherif, 933 F.2d 403 (7th Cir.1991). In Cherif, the SEC filed an enforcement action against Danny Cherif, an analyst with First National Bank of Chicago. Id. at 406. Cherif was fired from his job, but kept his employee credentials, which enabled him to access the building after-hours and discover confidential information about corporations preparing to engage in "extraordinary business transactions such as tender offers and leveraged buy-outs." Id. at 406. Cherif then used this illegally obtained information to buy and sell stock in these companies, reaping huge windfalls. Id. In executing this scheme, Cherif worked with Khaled Sanchou. To make his stock trades, Cherif opened brokerage accounts in both his and Sanchou's name. Id. at 406-07.
 
 
 39
 At the outset of the SEC enforcement action against Cherif, the SEC obtained a restraining order freezing the assets of both Cherif and Sanchou. Id. at 407. The restraining order was turned into an injunction freezing the assets of Cherif and Sanchou. Id. Sanchou appealed the freezing of his assets.
 
 
 40
 The Seventh Circuit considered whether the district court had subject matter jurisdiction to freeze Sanchou's assets. Id. at 413. The court acknowledged that the securities laws have "been construed to allow the granting of any form of ancillary relief * * * where necessary and proper to effectuate the purposes of the statutory scheme." Id. (internal quotation marks omitted). The court then stated that this "language advocates that all equitable powers residing in the district court be visited upon the defendant or violator before the court. Nothing in the [securities laws] or case law suggests that [the securities laws] authorize[] a court to freeze the assets of a non-party, one against whom no wrongdoing is alleged." Id. at 413-14 (citations omitted). Later, the Seventh Circuit indicated that Sanchou and his account may not have been just a stooge under Cherif's control:
 
 
 41
 Other facts, however, suggest that Sanchou's claim of title to the funds is not a sham and that Sanchou might even have helped Cherif to carry out his scheme. Sanchou supplied the $100,000 check used to open the [brokerage] account. On the day after the temporary restraining order was entered, Sanchou attempted to have the funds in the accounts wired overseas.
 
 
 42
 Id. at 415.
 
 
 43
 Although Cherif appears to be similar to this case, the Seventh Circuit's analysis is inapplicable here for three reasons. First, the Seventh Circuit considered only the authorization provided by the securities laws. In Hickey's case, the district court's authority to impose the asset freeze is supplied by the inherent power of the court to give necessary relief, along with the "strong federal interest in insuring effective relief in SEC actions brought to enforce the securities laws." Wencke, 622 F.2d at 1372. Second, the SEC in Cherif had not yet obtained any judgment. Here, the district court long ago ordered Hickey to disgorge the proceeds of his illegal activities, and more recently adjudged him in contempt for failing to do so. Therefore, the district court in this case properly froze the Brokerage's assets to effectuate relief already given. Third, Cherif did not exercise total control over Sanchou. Indeed, as the Seventh Circuit noted, Sanchou was active in the management of his own separate brokerage account.
 
 
 44
 Cherif, 933 F.2d at 415. In contrast, Hickey had unfettered control of the Brokerage. For these reasons, Cherif's holdings do not affect our conclusion.
 
 IV
 
 45
 It is the unimpeded nature of Hickey's control that is the key fact justifying the district court's asset freeze. Without Hickey's complete control over the Brokerage, it would be a difficult question whether the district court exceeded its authority in freezing the Brokerage's assets. We emphasize that the control here was over the entire entity of the Brokerage, not just over the cash held by the Brokerage. This is an important distinction. Contrary to the SEC's arguments before us, the mere fact of control over assets whose title belongs to a third party does not justify freezing the third party's assets. If it did, the scope of third-party assets subject to freeze would be too broad. Instead, the critical control relationship is between the wrong-doing defendant and the third-party entity. Here, Hickey's control knows no limits; he dominates the entire management of the Brokerage and can use its assets for personal, as well as business, ends. This absolute control justified the district court's order.
 
 
 46
 We DISMISS Hickey's appeal (No. 01-17027), and we AFFIRM the district court's order freezing the Brokerage's assets (appeal No. 01-17214).
 
 
 
 Notes:
 
 
 [1]
 We have jurisdiction to review the freezing of the Brokerage's assets. 28 U.S.C. § 1292(a) provides jurisdiction to review interlocutory injunctions, such as this asset freezeSee United States v. Roth, 912 F.2d 1131, 1132-33 (9th Cir.1990).