[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11027

_____

D.C. Docket No. 1:14-cv-22739-JLK

U.S. COMMODITY FUTURES TRADING COMMISSION,

Plaintiff – Appellee,

versus

ROBERT ESCOBIO,

Defendant – Appellant,

SUSAN ESCOBIO,

Intervenor.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 6, 2020)

Before ED CARNES, Chief Judge, BRANCH, and TJOFLAT, Circuit Judges.

PER CURIAM:

This case involves the enforcement of a judgment the Commodity Futures Trading Commission ("CFTC") obtained against Robert Escobio.  Among other things, the judgment ordered Escobio to pay $1,543,892 within 10 days in restitution to the investors who fell victim to his commodity-fraud scheme.  Instead of enforcing the restitution order pursuant to legal remedies provided by the Federal Debt Collection Procedures Act ("FDCPA"), the CFTC asked the District Court to enforce Escobio's payment of restitution pursuant to its civil contempt power.

Following a show-cause hearing, the Court held Escobio in contempt for failing to pay the restitution as ordered.  Rather than sanctioning Escobio's contempt, however, the District Court *sua sponte* modified its restitution order and required Escobio to pay $350,000 within 10 days of its revised order, and $10,000 per month thereafter.  If Escobio failed to make any of the payments, on receipt of "written notice from the CFTC," the Court would order the U.S. Marshals Service to take him into custody and jailed.

Escobio appeals the District Court's contempt adjudication and its *sua sponte* modification of the restitution provisions of its judgment.  Concluding that those provisions constitute a money judgment enforceable under the FDCPA, but not by the District Court's civil contempt power, we vacate the Court's contempt adjudication and its modification of the restitution provisions of its judgment.

2

I.

A.

This is not the first time this case has been before us. The current appeal arises from the CFTC seeking to enforce a judgment that we partially upheld. *See Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018). As we explained there, Escobio was the Chief Executive Officer and Director of Southern Trust. *Id.* at 1319. The CFTC, acting on a customer complaint, investigated Southern Trust and Escobio (collectively, the "Defendants") for commodities fraud. *Id.* at 1320. The CFTC filed suit against the Defendants alleging that they had engaged in two illegal schemes in violation of the Commodities Exchange Act ("CEA"). *Id.* at 1321.

In the first, which we deemed the "unregistered-futures scheme," the CFTC alleged that the Defendants were not registered as futures commission merchants. *Id.* In the second, the "metals-derivative scheme," the CFTC alleged that the Defendants accepted money from investors for metals, but instead invested the money in metal derivatives. *Id.* In addition, the complaint alleged, the Defendants charged these investors interest for nonexistent loans. *Id.* at 1322.

Following a bench trial, the District Court entered a judgment awarding restitution for losses the investors incurred from both schemes. *Id.* at 1328. For

3

the metals-derivative scheme, it ordered the Defendants to pay $1,543,892. *Id.*

For the unregistered-futures scheme, it ordered the Defendants to pay $559,725.

*Id.* The Court held the Defendants jointly and severally liable and ordered

payment of the "Restitution Obligation" within ten days. The Court appointed the

National Futures Association[1] as Monitor to collect and distribute the restitution

payments to those who lost money in connection with the two schemes.[2] The

Court ordered Defendants to cooperate with the Monitor, including executing any

documents necessary to release funds for payment toward the Restitution

Obligation. The Court further made each investor who suffered a loss an intended

third-party beneficiary under Rule 71 of the Federal Rules of Civil Procedure. The

Court also permanently enjoined the Defendants from participation in commodities

trading and ordered other civil penalties, payable to the CFTC.

Escobio appealed. On January 22, 2018, we determined that the "CFTC did

not prove that the Defendants' violations in the unregistered-futures scheme caused

---

[1] "The National Futures Association ('NFA') is a congressionally authorized futures industry self[-]regulatory organization. The purpose of the NFA is to assure high standards of business conduct by its Members and to protect the public interest." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1326 n.3 (11th Cir. 2002).

[2] The Court's order enables the Monitor to treat restitution payments as civil monetary penalty payments "[i]n the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical." The District Court did not explain why the Monitor had the power to convert restitution into a civil monetary penalty.

any loss" and vacated that portion of the restitution award. *Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 880 F.3d 1252, 1268 (11th Cir. 2018).

On rehearing on July 12, 2018, we arrived at the same outcome, but by different reasoning. *S. Tr. Metals, Inc.*, 894 F.3d at 1313. We vacated the restitution award for the unregistered-futures scheme after determining that the registration violation did not proximately cause the loss as required by the CEA. *Id.* at 1335. We affirmed the restitution award for the metals-derivative scheme. *Id.* Our mandate issued on October 26, 2018.

### B.

In March 2018, while Escobio's appeal was pending, the CFTC moved the District Court to issue an order requiring Escobio to show cause for his failure to pay the Restitution Obligation and the civil penalties. Escobio challenged the motion, arguing that the Restitution Obligation and the civil penalties are money judgments that cannot be enforced pursuant to the civil contempt power. The District Court decided that it could invoke the contempt power to coerce payment of the Restitution Obligation, but that it lacked any authority to coerce payment of the civil penalties. The Court reasoned that because restitution was an equitable remedy—not a money judgment—it could be enforced by the civil contempt power

5

rather than by the remedies provided by the Federal Debt Collection Procedures Act ("FDCPA").

The District Court then granted the CFTC's motion and ordered Escobio to show cause for his failure to pay the Restitution Obligation. The District Court held evidentiary hearings on October 24 and 25, 2018—a few months after we granted rehearing in *Southern Trust Metals*, but one day before we issued our mandate. During the hearing, Escobio testified that he had paid approximately $3,525 to the restitution fund. He claimed that he could not afford to pay more than $100 per month toward the Restitution Obligation.

On March 18, 2019, the District Court held Escobio in contempt for failing to pay the Restitution Obligation. The Court found that Escobio did not lack the ability to pay the ordered restitution in full given the significant value of his assets, discretionary spending, the benefits of his and his wife's incomes, and money received from other sources.

1.

Based on evidence Escobio presented, the District Court concluded that he had at least $941,447 in assets. The Court identified the following assets:

- An individual retirement account ("IRA") worth $300,000;
- A joint securities-investment account worth $35,000;
- $3,000 in a joint checking account;

6

- $554,000 of equity in a co-owned Florida house;
- $21,000 of personal property.[3]

Escobio and his wife, Susan Escobio, jointly own the securities-investment account, the checking account, and the Florida house. Escobio argued that these joint assets are exempt under state law. He also argued that his IRA is exempt from consideration under state law.

The District Court rejected Escobio's arguments. It reasoned that "courts have broad equitable powers to reach assets otherwise protected by state law to satisfy an order for restitution." The Court found that because Escobio withdrew approximately $250,000 from his IRA following the entry of the final judgment, he made a "deliberate, conscious choice to pay his own expenses instead of paying the judgment." The Court ruled that "Escobio cannot insulate himself from the restitution order by keeping his assets in an IRA to spend as he chooses." The

---

[3] The sum of the identified assets is $913,000. The Exhibit that Escobio submitted to the District Court identified $941,447 in assets as follows:
- Individual Assets
    - IRA: $309,921
    - Salary (gross): $14,102 (to date)
    - Wells Fargo Bank Account: $944
    - Personal Property: $21,000 est.
    - Total: $345,967
- "Assets owned with wife as joint tenants by the entirety"
    - Homestead property equity: $554,369 est.
    - TD America Bank: $3,120
    - Securities acct.: $38,021
    - Total: $595,510

Although Escobio identified his salary as an asset, the Court considered it in its analysis of Escobio's income.

Court also found that Escobio had the "unfettered ability to withdraw money" from the joint investment and checking account.  Citing to *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 27 n.29 (D.D.C. 2000), but without further analysis, the District Court determined that despite Florida's "homestead exemption," it could consider the value of Escobio's house in determining his ability to pay.  The District Court also noted that Escobio provided no reason that his personal property could not be sold to satisfy the Restitution Obligation.

2.

The Court also considered Escobio's expenses and both of the Escobios' incomes.  The Court acknowledged that Escobio makes approximately $30,000 to $40,000 per year as a pilot.  However, the Court found that Escobio's prioritization of discretionary payments[4] as well as multiple international travel trips evidenced "willful evasion of the Court's judgment."  The Court found that under "principles of equity," it could consider the income that Mrs. Escobio makes as the president of Southern Trust.  The Court determined that Mrs. Escobio's income was directly attributable to "Escobio's transfer of shares (and title) to her" and that, because

---

[4] The Court identified these payments as $118,700 to attorneys, $113,624 to credit cards, $40,076 in student loan payments for the benefit of Escobio's adult daughters, $36,548 in car lease payments, and $31,600 in checks written to cash.  The Court also found it noteworthy that Escobio pays twice as much for his cable as he claims he can pay to the restitution fund each month.

8

Southern Trust continues to operate and benefit Escobio in the same way as it did before he was barred from participating in the company, the Court could consider the benefits he derives from it.

## 3.

The District Court also considered the $200,000 to $300,000 in "loans" that Escobio had received from family, friends, and other unidentified sources in its determination of his ability to pay. The Court did not credit Escobio's testimony that these were repayments. Moreover, the Court reasoned, Escobio used this money for personal expenses but could have used it to pay the Restitution Obligation.

## 4.

After finding that it could consider Escobio's jointly-held assets, both Escobios' incomes, the extensive discretionary spending, and the unidentified "loans," the Court concluded that Escobio had not demonstrated his inability to comply with the final judgment. On March 18, 2019, the District Court held Escobio in civil contempt for failing to pay the Restitution Obligation (hereinafter the "Contempt Order"). But it did not immediately sanction him for the failure. Instead, the Court ordered Escobio to pay $350,000 to the CFTC within ten days "or be subject to coercive sanctions." The Court further ordered Escobio to pay off

the balance of the outstanding restitution award at the rate of $10,000 per month "or face coercive sanctions, which shall issue on motion by the CFTC." In a separate paragraph, the Court stated "should Robert Escobio not pay the sums identified above within ten (10) days of the issuance of this Order, upon written notice from the CFTC of the infringing Defendant's noncompliance, a warrant for his arrest shall issue and the United States Marshal Service is authorized to take Escobio into custody and incarcerated until such time as he fully complies with this Court's Order." Escobio appeals the Contempt Order.

## C.

Escobio requested a stay of the Contempt Order pending his appeal from both the District Court and this Court. It was denied. Meanwhile, after receiving notice from the CFTC that Escobio had failed to make the required upfront payment, the District Court ordered Escobio to voluntarily surrender to the U.S. Marshals Service on April 1, 2019 (hereinafter the "First Incarceration Order"). Two days later, Escobio filed an amended notice of appeal from the First Incarceration Order. Escobio paid $350,000 and thereby purged the contempt. The Court ordered his release from custody on April 26, 2019.

On August 13, the CFTC moved the District Court to issue coercive sanctions based on Escobio's failure to pay the $10,000 monthly installments. On

August 19—the day before oral argument in the current appeal, the District Court, without first issuing an order for Escobio to show cause, held Escobio in contempt and ordered him to surrender to the U.S. Marshals Service on August 20, 2019 (hereinafter the "Second Incarceration Order"). The CFTC thereafter filed a certificate that Escobio had paid the amount in arrears and the District Court ordered his release from custody on August 22, 2019.

## II.

### A.

We have jurisdiction to review the Contempt Order under 28 U.S.C. § 1291. Section 1291 imposes a finality test for appellate review. Contempt citations issued post judgment are subject to the test of finality and are not immediately appealable unless there is "*both* a finding of contempt and a *noncontingent* order of sanction." *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 977 (11th Cir. 1986); *see also Mamma Mia's Trattoria, Inc. v. Original Brooklyn Water Bagel Co.*, 768 F.3d 1320, 1325 (11th Cir. 2014).

In *Combs*, we distinguished orders that are "conditional or subject to modification" from those that impose a fine or penalty within a time certain that may not be avoided by some other form of compliance. 785 F.2d at 977. Conditional orders reflect an ongoing effort by the district court to prod the

11

contemnor into compliance. *Id.* The bar against appellate review of conditional contempt orders exists to avoid "disrupting" this "continuing, orderly course of proceedings." *Id.* at 976 (quoting *Drummond Co. v. Dist. 20, United Mine Workers of Am.*, 598 F.2d 381, 384 (5th Cir. 1979)). A district court has essentially "place[d] the keys of the prison cell in the contemnor's pocket" by encouraging the contemnor to comply with the order prior to the imposition of any sanctions. *Id.* at 977. But once sanctions are imposed, review of the order no longer "tie[s] the hands of the district court" because the district court has gone beyond just prodding compliance. *Id.*[5]

Therefore, and as we recently explained, "[w]hen a sanction is entered as a result of the contempt finding," it "render[s] the contempt judgment final and ma[kes] both the finding of contempt and the later sanction order appealable under 28 U.S.C. § 1291." *PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1212 (11th Cir. Sept. 24, 2019) (second and third alteration in original) (quoting *Sizzler Family Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1533 n.1

---

[5] *Combs* involved the District Court's issuance of two contempt orders. One order—which imposed sanctions—was immediately appealable, the other was not. We determined that we lacked jurisdiction to review the District Court's first order as it was part of a continuing effort to compel compliance. 785 F.2d at 978. That order held appellants in contempt and directed them to pay the amounts due under the parties' consent decree. *Id.* at 974. The second order rejected the contemnor's inability to pay claim and ordered the contemnor to be incarcerated for 21 days unless he demonstrated a good faith effort at compliance with the earlier order. *Id.* at 975. We had jurisdiction to consider the trial court's subsequent order, which incorporated by reference the earlier ruling. *Id.* at 978 n.2.

(11th Cir. 1986)).  In such circumstances, the judgment and the order containing the finding of contempt merge and become subject to review on appeal.  *Id.* (citing *Akin v. PAFEC Ltd.*, 991 F.2d 1550, 1563 (11th Cir. 1993)).  We have jurisdiction to review the First Incarceration Order and the underlying Contempt Order based on Escobio's amended notice of appeal.[6]

The CFTC argues that—despite the imposition of sanctions for the upfront $350,000 payment—we lack jurisdiction to review the portion of the Contempt Order that relates to future monthly payments because those sanctions are conditional.  But because the imposition of sanctions rendered the Contempt Order final, we can review the entire order, including the previously conditional sanctions.  The Contempt Order also provides that the warrant for Escobio's arrest "shall issue" as soon as the CFTC notifies the Court of Escobio's noncompliance.  There is nothing for the District Court to modify once it is notified of Escobio's noncompliance.  And in *Sizzler*, we concluded that a contempt order that imposed a "prospective fine scale" was immediately appealable.  793 F.2d at 1534 n.2.  Actual imposition of a penalty is not necessary for appellate review as "[b]eing placed under the threat of future sanction" is "an unconditional present sanction." *Id.*; *see also Chairs v. Burgess*, 143 F.3d 1432, 1435 (11th Cir. 1998) ("[W]e can

---

[6] Because sanctions were imposed, we need not decide whether the Contempt Order would independently qualify for review under 28 U.S.C. § 1291 for modifying the terms of a final judgment.

13

review the district court's order to the extent that contempt was found and a prospective fine—the $23.00 per day—was then imposed on the State.").  The necessity of notifying the Court of the contemnor's noncompliance does not deprive us of jurisdiction to review the Contempt Order.

B.

The CFTC next argues that the issue is moot because Escobio has purged the contempt.  It is well established that "once a civil contempt order is purged, no live case or controversy remains for adjudication." *In re Grand Jury Subpoena Duces Tecum*, 955 F.2d 670, 672 (11th Cir. 1992) (collecting cases) (holding that the appeal was moot because the contemnor had "completely purged his contempt"). To decide whether Escobio can justifiably challenge an order adjudicating him in contempt when the amount has already been paid would violate the constitutional prohibition against this Court "decid[ing] abstract, hypothetical or contingent questions." *Id.* at 671–72; *see also RES-GA Cobblestone, LLC v. Blake Const. & Dev., LLC*, 718 F.3d 1308, 1314 (11th Cir. 2013) (holding that the contemnor's challenge to the $250 per day contempt fine was moot because he had agreed to pay the accrued fine).

The District Court held Escobio in contempt for his failure to pay the Restitution Obligation in full and Escobio faces jail time each month that he fails to make a $10,000 payment.  Because Escobio has not "completely purged his

14

contempt," we can review the Contempt Order on the merits as it relates to future monthly payments.[7]

Moreover, the Contempt Order morphed the Restitution Obligation into a different kind of scheme. The District Court attempted to use a coercive *in personam* order to enforce an installment payment plan with incarcerative sanctions if Escobio did not comply. Injunctive relief is considered moot only if "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200, 1201 (11th Cir. 1997). Escobio's adherence to the new payment structure does not negate the possibility

---

[7] The CFTC brings to our attention a similar case from the Ninth Circuit. Our sister Circuit's opinion in *S.E.C. v. Hickey*, 322 F.3d 1123, 1127 (9th Cir. 2003), does not compel a different conclusion. The District Court found Hickey in contempt for his failure to pay his disgorgement obligation. *Id.* It ordered him to pay $20,000 per month over the next three months or report for custody. *Id.* It also ordered Hickey to adhere to the disgorgement payment schedule by paying $40,000 per month thereafter. *Id.* The Ninth Circuit determined that it lacked jurisdiction to hear the appeal because "the district court never imposed sanctions pursuant to its contempt order." *Id.* It continued that even if it had jurisdiction, the appeal would be moot because Hickey had made the three required payments. *Id.*

This case is not on point, however, because the Ninth Circuit did not consider whether it had jurisdiction to review the $40,000 future monthly payments. And unlike Escobio, there is no indication that Hickey would face incarceration if he failed to make those payments, because the order did not threaten sanctions for failure to make those payments. Here, the District Court has ordered Escobio to report for custody twice and imposed a noncontingent threat of future incarceration.

15

that he will fail to pay in the future nor has it "completely and irrevocably" paid off the restitution award. His challenge to the payment scheme is not moot.

C.

Next, we must determine whether the District Court had jurisdiction to issue the Contempt Order. The filing of a notice of appeal generally divests a district court of jurisdiction as to those issues involved in the appeal. *RES-GA Cobblestone*, 718 F.3d at 1314; *see also Weaver v. Fla. Power & Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999). The appeal lasts until we issue the mandate. *Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 645, 649 (11th Cir. 1990); *see also Martin v. Singletary*, 965 F.2d 944, 945 (11th Cir. 1992) ("The stay of the mandate . . . delays the return of jurisdiction to the district court to carry out our judgment in that case."). Here, Escobio argues that the District Court lacked jurisdiction to hold the evidentiary hearings on its order to show cause because our mandate had not yet been issued.[8]

However, an appeal does not automatically stay the enforcement of a judgment. Wright & Miller, 16A Fed. Prac. & Proc. Juris. § 3954 (5th ed. 2019). A party can move to have the judgment stayed upon appeal. Fed. R. Civ. Pro. 62;

---

[8] The District Court found Escobio in contempt on March 18, 2018—nearly five months after we issued the mandate in *Southern Trust Metals*. However, the District Court based its determination on evidence obtained in the hearing held before we issued the mandate in October.

16

Fed. R. App. P. 8. Escobio did so—and his motion was denied. Absent entry of a stay, a district court retains jurisdiction to enforce its judgment—via contempt or other means—during the pendency of an appeal. *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1202 (11th Cir. 2016); *see also Resolution Tr. Corp. v. Smith*, 53 F.3d 72, 76–77 (5th Cir. 1995).

## III.

Because we have jurisdiction to consider this live controversy, we turn now to the merits. Escobio first argues that the District Court had no authority to adjudge him in contempt and that the CFTC was limited to the enforcement remedies provided by the FDCPA to collect on the Restitution Obligation. Escobio also claims that the District Court erred by considering exempt assets and Mrs. Escobio's income in its consideration of his ability to pay the Restitution Obligation. We agree on the first point and need not reach the second.

## A.

Whether a district court can invoke its civil contempt power to enforce a judgment depends on the nature of that judgment. Injunctions, and other coercive equitable remedies, have historically been enforceable via the court's civil contempt powers. Money judgments, on the other hand, are enforceable "by a writ of execution, unless the court directs otherwise." Fed. R. Civ. P. 69. The

17

procedure of that execution is governed by state law, or, when applicable, federal law. *Id.*

This case hinges on a federal statute that enables the CFTC to seek "equitable remedies," including "restitution" for customer losses, against any person found to have violated the CEA. The CFTC argues that the District Court has the inherent power of civil contempt to enforce this "equitable" restitution. Escobio argues that the Restitution Obligation is a money judgment and there is no federal law that authorizes the use of civil contempt to enforce this money judgment. We agree with Escobio.

First, we describe the statutory scheme at issue and how the District Court concluded that the restitution constitutes an equitable remedy. Second, we explain why the restitution at issue here is, in fact, a money judgment—a remedy at law, rather than a remedy at equity.

1.

The CEA empowers the CFTC to bring an action against any registered entity or person for violations of the CEA. 7 U.S.C. § 13a-1. Among the compliance remedies, the CFTC can seek a "permanent or temporary injunction or restraining order," § 13a-1(b), "writs of mandamus, or orders affording like relief," § 13a-1(c), and "civil penalties," § 13a-1(d). Civil penalties include both general

18

penalties and equitable remedies.  § 13a-1(d)(1) & (3).  The statute authorizes the

CFTC to seek and the court to impose "equitable remedies including" "restitution

to persons who have sustained losses proximately caused by such violation (in the

amount of such losses)" and "disgorgement of gains."  § 13a-1(d)(3).

Collection of restitution awards under the CEA is governed by the FDCPA,[9]

which provides the "exclusive civil procedures for the United States" to recover on

judgments for debt owed to the United States, including judgments for restitution.[10]

28 U.S.C. §§ 3001 and 3002(3)(B) & (8).  The FDCPA provides several remedies

to collect on judgments, including execution, installment payment orders, and

garnishment.  *Id.* §§ 3202–3205.  It does not include the power of civil contempt.

The FDCPA's Rule of Construction provision, however, provides that the outlined

procedures "shall not be construed to supersede or modify" the authority of a court

"to exercise the power of contempt under any Federal law."  *Id.* § 3003.

According to the District Court, because the restitution awarded here was

equitable in nature, the FDCPA does not preclude the use of the civil contempt

---

[9] The FDCPA provides that "[t]o the extent that another Federal law specifies procedures for recovering on a claim or a judgment for a debt arising under such law, those procedures shall apply to such claim or judgment to the extent those procedures are inconsistent with this chapter."  28 U.S.C. § 3001.  The CFTC has not pointed us to, nor have we found, where the CEA specifies procedures for collection of restitution, so the CFTC is subject to the limitations in the FDCPA.

[10] Restitution under the CEA is reduceable to a debt owed to the United States for the use and benefit of the persons who have sustained losses proximately caused by Escobio's violation of the CEA.

power to enforce it.  By this logic, because the CEA authorizes equitable restitution, and because equitable restitution (not in the form of a money judgment) was historically enforced via the power of contempt, the CEA's authorization of equitable remedies carries with it the power to enforce by civil contempt.  Thus, the CEA enabled the Court to invoke its civil contempt power.

2.

Contrary to the District Court's conclusion and the statute's label, the restitution at issue here is properly characterized as a money judgment.  And as a money judgment, it is not enforceable by contempt.[11]  *Combs*, 785 F.2d at 980.

The District Court erred by assuming that the "equitable remedies" language in the statute automatically conferred the power to enforce the award by contempt. Equitable remedies can take a variety of forms.  "Some equitable remedies are restitutionary, in money or otherwise." 1 DAN B. DOBBS, LAW ON REMEDIES, § 2.1(1), at 56 (2d ed. 1993).  Others are coercive; commanding the defendant to do or refrain from a specified act via an *in personam* order.  *Id.*  Coercive remedies

---

[11] We need not decide whether a court can invoke its civil contempt power to enforce other equitable remedies under the CEA.  For example, the CFTC directs our attention to cases which uphold an order of civil contempt for failure to pay disgorgement under the CEA.  *E.g.*, *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1531 (11th Cir. 1992).  But disgorgement is not a money judgment reduced to a debt owed to the United States under the terms of the FDCPA.  *See*, *e.g.*, 28 U.S.C. § 3002(3)(B) (definition of debt does not include disgorgement); *S.E.C. v. Huffman*, 996 F.2d 800, 803 (5th Cir. 1993). Here, the Restitution Obligation is reduceable to a debt.  28 U.S.C. § 3002(3)(B).

are distinctive in that they are enforceable by the power of contempt. *Id.* "Money restitution," however, can be enforced "without resort to any special equity powers." DOBBS, § 2.1(2), at 59.

As the Supreme Court made clear in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212, 122 S. Ct. 708, 714 (2002), "not all relief falling under the rubric of restitution is available in equity." The Court distinguished equitable restitution from legal restitution. *Id.* Historically, a plaintiff could seek equitable restitution when "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to *particular* funds or property in the defendant's possession." *Id.* at 213, 122 S. Ct. at 714 (emphasis added) (citing DOBBS, § 4.3(1), at 587–88); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4 (Am. Law Inst. 2011) ("[T]he hallmark of equitable remedies in restitution cases is that they give relief to the claimant via rights in identifiable assets."). A court could impose a constructive trust or an equitable lien and order the defendant to transfer title or give a security interest to the plaintiff. *Id.* In contrast, when the money or property could not be identified, a plaintiff could seek legal restitution by obtaining a judgment for the defendant to "pay a sum of money." *Id.*

Here, the final judgment constitutes a money judgment for several reasons. Most plainly, the final judgment required Escobio to pay approximately $1.5

21

million within ten days, subject to accruing interest.  That is a classic money judgment.  It provides for a sum certain, non-contingent "payment of money . . . that the court found to be due and owing." *Combs*, 785 F.2d at 980; *see also Penn Terra Ltd. v. Dep't of Envtl. Res., Com. of Pa.*, 733 F.2d 267, 275 (3d Cir. 1984) ("[A money judgment] need consist of only two elements: (1) an identification of the parties for and against whom judgment is being entered, and (2) a *definite* and *certain* designation of the amount which plaintiff is owed by defendant.").  It does not provide the victims of Escobio's schemes with relief via the right to claim particular assets.

Additionally, the District Court prescribed § 1961 post-judgment interest on the award, which it could do only on a money judgment.  Section 1961(a) allows interest on "any money judgment," but does not affect the interest imposed on other judgments.  28 U.S.C. § 1961(c)(4).

Finally, the history of the CEA buttresses our conclusion here.  Congress added the "equitable remedies" subsection to the CEA in 2010.  Pub.L. 111-203, Title VII, §§ 741(b)(5), 744, July 21, 2010, 124 Stat. 1731, 1735.  Prior to the amendment, we had held that a court's authority to issue injunctions under § 13a-1(a) carried with it the "full range" of equitable powers, including the power to grant restitutionary remedies.  *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008).  Equitable restitution,

22

however, was limited to the amount that the defendant wrongfully gained, rather than the amount that the customers lost. *Id.* at 1345. As we explained, the equitable power of restitution was "designed to cure unjust enrichment of the defendant *absent consideration of the plaintiff's losses*." *Id.* (quoting *Waldrop v. S. Co. Servs., Inc.*, 24 F.3d 152, 158 (11th Cir. 1994)). Because awarding damages in the amount of customer losses could exceed the remedial basis, we reasoned that it was beyond the scope of the court's equity powers to base restitution on customer losses. *Id.*

After the 2010 amendments, however, restitution under the CEA is awarded "to persons who have sustained losses proximately caused by such violation" and "in the amount of such losses." § 13a-1(d)(3). As we held in *Southern Trust Metals*, the "statutory language, by its terms, permits restitution *only* for losses proximately caused by a violation." 894 F.3d at 1329 (emphasis added). We upheld the restitution award for the metals-derivative scheme as the customers sustained losses when their accounts were liquidated at a down time in the market. *Id.* at 1334.

By its terms then, restitution under the CEA must consider customer losses and therefore cannot be equitable restitution. *See Wilshire*, 531 F.3d at 1345. Furthermore, because the court ordered Escobio to "pay a sum of money" for the customers' losses instead of returning specific property, it is legal restitution rather

23

than equitable restitution.  *See Knudson*, 534 U.S. at 213, 122 S. Ct. at 714.  As the final judgment awarded legal restitution, it is a money judgment.  As a money judgment, the restitution award is subject to the limitations in the FDCPA.

The FDCPA limits the enforcement remedies available to the CFTC when it seeks to collect restitution.  It provides the CFTC with multiple tools, including execution, installment payment orders, and garnishment.  As we explained in *Bradley v. United States*, to the extent that the CFTC has identified specific assets, it can seize that property using writs of attachment or writs of garnishment.  644 F.3d 1213, 1310 (11th Cir. 2011).  If the CFTC is unaware or uncertain of other property that Escobio owns, it can depose persons having knowledge of his assets or obtain other discovery.  *Id.*; 28 U.S.C. § 3015.  To the extent that the CFTC suspects that Escobio has engaged in fraudulent transfers to avoid paying the Restitution Obligation, subsection D of the FDCPA provides mechanisms for the CFTC to obtain relief.  28 U.S.C. §§ 3301–3308.  It was reversible error for the District Court to hold Escobio in contempt for failure to pay the money judgment.

It appears that the District Court attempted to morph the lump-sum restitution award into an injunctive installment plan backed up by the threat of incarceration.  That is error for the reasons explained above.   The FDCPA provides numerous means of satisfying the Restitution Obligation and equity intervenes only when there is no adequate remedy at law.  *Bradley*, 644 F.3d at

24

1311.  In addition, the installments are still money judgments that cannot be enforced by contempt.  *See Combs*, 785 F.2d at 980 (concluding that regardless of whether the consent decree was payable "immediately or in installments," it is a money judgment).

Our conclusion does not deprive a district court from ever using its civil contempt power.  Courts have the inherent power to enforce compliance with their orders through civil contempt.  *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 1535 (1966).  A court can use its power of contempt in ancillary proceedings in aid of enforcement.  For example, in *Combs*, we refrained from passing on the propriety of the District Court's contempt order as it was not immediately clear why the Court had issued the order.  785 F.2d at 981.  As we clearly laid out, if the Court used its contempt power to coerce the appellants into paying the money judgment, it was improperly entered.  *Id.*  If, however, the Court used its contempt power to coerce the appellant into providing financial records, then it was a proper use of the contempt power.  *Id.*  We remanded so the Court could clarify the purpose of the order.  *Id.*  Unlike the questionable order in *Combs*, there is no doubt that, here, the District Court attempted to use its contempt power to force Escobio to pay the Restitution Obligation.[12]  That is reversible error.

---

[12] We also pause to caution that when a district court invokes its civil contempt power, it must do so in accordance with due process.  Per the terms of the Contempt Order, an arrest

25

B.

Because the District Court lacked the authority to enforce the Restitution Obligation pursuant to its civil contempt power, we need not consider Escobio's arguments that the Court erred in considering exempt assets or Mrs. Escobio's income in its determination of Escobio's ability to pay. The District Court's Contempt Order, issued on March 18, 2019, and its First Incarceration Order, issued on April 1, 2019, are VACATED.

SO ORDERED.

---

warrant "shall" issue upon notification by the CFTC of Escobio's noncompliance. Any hearing to consider why Escobio failed to comply is triggered only after "notification from the U.S. Marshal's Office that Escobio is in custody." But that, in essence, holds Escobio in contempt for future conduct. As we have previously held, a court cannot hold that certain future conduct is contumacious. *Mercer v. Mitchell*, 908 F.2d 763, 767 (11th Cir. 1990). Such a finding deprives the alleged contemnor of his due process rights of notice and hearing. *Id.* at 767. A "defendant should always be given an opportunity to show that changed circumstances would make holding him in contempt unjust." *Id.* at 769.